Banco De Sonora v. Bankers' Mut. Casualty Co. *et al.*,
Appellants.

**Insurance of packages by mail:** LETTER OF ADVICE: WHAT CONSTI-
1  TUTES MAILING.  Where a policy insuring packages sent by mail
provided that the article should be deposited and registered at the
postoffice, and a letter of advice descriptive of the property
" should be deposited in the postoffice at the place of mailing,"
before the insurance attached, it is held that mailing the letter of
advice by depositing it in a mailing box was not a compliance with
the contract.

**Condition precedent:** WAIVER.  Where an insurance contract con-
2  tained a condition precedent to its becoming effective, which was not
complied with by the assured, an exaction of additional proofs of
loss was not a waiver of the condition.

**Adult.**  An unmarried male person is not an adult either at common
3  law or under the statutes of this State, until arriving at 21 years
of age.

**Contracts.** PERFORMANCE: ENFORCEMENT: LAW GOVERNING.  Where
4  a contract contemplates part performance at a particular place,
the law of the place at which the thing was done governs, which,
in the absence of a contrary showing is presumed to be the same
as the law of the place where enforcement is sought.

**Foreign laws:** PROOF OF SAME.  The law of a foreign country may be
5  proved by parole, but the evidence must come from one shown to
be familiar with the law of such country, or in a position rendering
such knowledge probable.

**Foreign laws:** JUDICIAL NOTICE.  Our courts will probably take ju-
6  dicial notice of the general system of jurisprudence of a foreign
country, as a matter of history, but the adoption of any particular
law requires specific proof.

*Appeal from Polk District Court.*— Hon. C. A. Bishop,
Judge.

WEDNESDAY, JULY 13, 1904.

THE Bankers' Casualty Company, a corporation organ-
ized for the purpose of insuring banks against loss from

burglaries, thefts, and other losses, issued its policy to plaintiff, an incorporated bank located at Hermosillo, Mexico, June 22, 1900. P. Sandoval & Co., a copartnership operating a bank at Nogales, Mexico, acted as agent of the plaintiff in making remittances in the United States, and, as such agent, put in the post office at Nogales, Arizona, immediately across the international line, a package containing $5,000 in Mexican currency, duly registered and addressed to the Bank of Bisbee, Bisbee, Arizona, which was on the same day stolen from the mail sack. The plaintiff claims it was insured in the above company, and in this action sought recovery for the money lost, amounting in value in our money to $2,400. The Boston Insurance Company intervened because of its obligation to defendant as a reinsurer. Trial resulted in a verdict for plaintiff, on which judgment was entered. The defendant and intervener appeal.— *Reversed.*

*Dale & Allen* and *G. W. Bowen,* for appellants.

*Chas. L. Powell,* for appellee.

LADD, J.— The contract of insurance was what is known as a "running policy," in which the parties, the nature of the property to be covered, and the risk to be assumed are certain, but other prescribed conditions must be observed before it attaches to specific property. Among other things, it stipulated indemnity for loss of money "from the time of its deposit and registration at the post office * * * until delivered at the place of address to the consignees." P. Sandoval & Co., acting as agent of plaintiffs, deposited a package of Mexican currency in the post office at Nogales, Arizona, addressed to the Bank of Bisbee, at Bisbee, Arizona, March 21, 1900, at about eleven a. m., which was duly registered. The postmaster left the post office at six o'clock p. m., as usual, without closing the door. The portion used by the public, however, was separated by a partition, not reaching to the ceiling, from the apartment where the mails were kept,

and the door through this was fastened, as were also the mail pouches. Upon his return at nine o'clock p. m., he discovered that a slit had been cut in one of these pouches, and this package extracted. Was it insured? The defenses interposed involve two conditions of the policy, which may be set out:

First. No risk to be considered as insured hereon until a letter addressed to the company at Des Moines, Iowa, detailing particulars of mailing with the description of the property and the amount insured, is deposited in the post office at the place of mailing, which must be done while the property is in good safety and in all cases prior to the departure of the mail or express which carries the property insured.   *   *   *

Eighth. It is warranted by the assured that the packing and sealing of the package containing the property insured hereunder shall be witnessed by two adults, one of whom shall have charge of the same until deposited and registered at the post office or delivered to the express company.

The packing and sealing were witnessed by A. Biester and F. H. Saldamando, two adults; and F. Dato, then about eighteen years old, carried the package to the post office and caused it to be registered. The evidence tended to show that the letter was prepared in compliance with the first condition at about two o'clock in the afternoon. Was it mailed as required before the package was stolen? Immediately across the international line from Nogales, Arizona, is a town of the same name in the State of Sonora, Mexico. The Southern Pacific Railroad runs through these places in a northerly and southerly direction, with a depot on each side of the line. At the northeast corner of that in Sonora a mail box is maintained by the republic of Mexico, while opposite and at the southeast corner of the depot, in Arizona, is another mail box, maintained by the government of the United States, under the supervision of the postmaster of Nogales, Arizona. The place of business of

1. INSURANCE OF PACKAGES BY MAIL: letter of advice; what constitutes mailing.

Sandoval & Co. is but a short distance southeast of this, and
hence the mail box is more convenient than the post office
building, which was three hundred and fifty yards distant.
The envelope in which the letter of advice was placed in
accordance with the first-quoted condition was postmarked,
" Benson & Nogales, Mar. 22, 1900, R. P. O.," which in-
dicated that it was mailed on the railroad mail car, No-
gales, Arizona, at about 5 :10 o'clock on the morning after the
taking.   In the absence of explanation, the insurance com-
pany quite naturally supposed the letter had been mailed
after the loss, and repeatedly insinuated as much in its
correspondence; saying it was the same " as if a man would
attempt to insure his house against fire after it had burned
down."   But the plaintiff introduced evidence tending to
prove that Gayou, a messenger boy of the bank, deposited the
letter of advice in the United States mail box at about 5 :45
o'clock in the afternoon of March 21st, and that, according
to custom, the assistant to the local postmaster removed
the mail from such box and handed it to the main clerk the
following morning.   Conscious of these facts, plaintiff —
especially its agent — grew indignant over the intimations of
the insurance company.   Each had material information not
possessed by the other, and this accounts for the unpleasant
correspondence between them.   The only issue submitted to
the jury was whether the letter was deposited in the mail
box prior to the stealing of the package of money.   The
jury's finding that it was is amply supported by the evidence.
But appellant insists that, even if placed in the box in time,
this was not in compliance with the conditions requiring it
to be deposited in the post office.   In response, appellee first
argues that this objection has been waived by defendant by
exacting additional proof of loss subsequent to ascertaining
the fact.   Authorities to the effect that forfeiture may not be
insisted upon in such circumstances seem to be relied upon.
They are not in point, for the reason that this requirement
is not one relating to the conduct of parties, or the care

of property during the life of the policy. It is a condition precedent to the risk attaching at all, and to be performed before policy takes effect with respect to the property to be insured. To hold that it might be waived, as contended, would be tantamount to declaring that recovery might be had in the absence of a contract. No authority so holding is cited, and we are confident none can be found.

Was dropping the letter in the mail box depositing it " in the post office at the place of mailing," within the meaning of the first condition of the policy ? In the statutes of the United States the word " post office " has a well-defined meaning. Section 3829 *et seq.,* Rev. St. U. S. (U. S. Comp. St. 1901, page 2608). The postmaster general is required to establish post offices at such places on post roads as he may deem expedient, and a postmaster is to be placed in charge of each post office. As contemplated in these statutes, and in the sense in which the word is ordinarily used, " post office " is the room or building where the local business of the postal department is conducted. Thus Webster defines it as " an office under governmental superintendence, where letters, papers, and other mailable matters are received and distributed; a place appointed for attending to all business connected with the mail." That the word was employed in this sense appears from a comparison of the first and eighth clauses of the contract, and in the fair construction of the former. The first condition requires the letter of advice to be " deposited in the post office at the place of mailing," and the second exacts the mailing of the package by being " deposited and registered at the post office." In other words, the letter of advice may not be deposited in the post office of some place other than that of the village, town, or city where the package is registered. The language employed also indicates that it was intended to distinguish between the mere matter of mailing the letter and the place where mailed, for it is expressly required, not that it be mailed or placed in the United States mails, but that it be

deposited at a particular place, to wit, the post office in the locality where the package has been mailed. In view of this language, we do not feel at liberty to say that the deposit in the mails generally, was intended. True, the mail box was shown to have been under the control and supervision of the postmaster, and letters and parcels mailed in it, though not carried to the post office, passed into his custody as completely as though left at the building occupied as a post office. But this cannot be held to constitute a mere receiving box three hundred and fifty yards from the building occupied by the postmaster, without physical connection therewith, a part of the post office itself. It was still a mail box, and not a post office. Otherwise boxes miles away may be appropriately so declared, and the deposit of letters in any of the mail boxes in a city having the free delivery system must be construed to be depositing in the post office. These may be under a separate bureau of the general government, as contended, but the mails are gathered therefrom at stated periods, as in the instant case, and carried to the post office for distribution. In a generic sense — for instance, as used in the Constitution, authorizing Congress to establish post offices and post roads — the entire system of forwarding mails may be regarded as the post office, and in this sense I was of opinion on the former submission that the words as employed in the contract might be construed. But the condition in the contract has reference to a particular post office at the place of mailing of the package, and therefore the designation could not have been intended to have reference to the general system. A very good reason for exacting the mailing of the letter of advice in the post office is that thereby prompt postmarking is secured, and the company advised therefrom of the place where deposited, and approximately of the time when its policies attach. Thus the post office at Nogales was furnished by the government with a stamp indicating the hours of the day when mail was received; and, had this letter been deposited in the post office,

instead of the box, it would, in all probability, have borne a postmark stating when received — indicating that it had been mailed before six o'clock p. m. of March 21st, and therefor before the robbery, which occurred shortly after six. It would also have shown that it was mailed at Nogales, instead of at any point between that place and Benson, Arizona. The company had the right to so frame its contract as to be able to avail itself of such evidence. This did not prevent dropping letters in the post office after closing time, but it provided proof thereof by the appearance of the postmark dated the following morning. Such evidence may not be infallible, but no argument is required to demonstrate that it might prove exceedingly helpful to the insurer in the investigation of losses.

It is said, however, that the defendant, by putting a different construction on the contract, waived that we **2. CONDITION PRECEDENT: waiver.** have given it, and elected to base its defense on another ground. It is true that in certain letters and blanks the insurer referred to the mailing of the letter before or after the robbery, but the manner of the mailing was not mentioned. It is not questioned but that the letter had been deposited in the mails. The first proofs of loss represented that it had been mailed as required by the policy, and the correspondence shows conclusively that the defendant was insisting all along that the contract had not attached, owing to the failure to mail the letter of advice in accordance with the first condition, and we have not found anything in the record indicating an intention of treating the deposit in the mail box as a compliance therewith.

Some reliance is placed on section 1743 of the Code, providing, in substance, that the violation of any condition or stipulation rendering a policy void, before loss, shall not defeat recovery, if it is made to appear that the omission to observe such condition or stipulation did not contribute to the loss. This section has no application, for that, by not complying with the condition precedent, no contract of

insurance was effected, and hence there was no condition or stipulation to be violated.

II.    By the eighth clause the money package is warranted by the insured to have been packed and sealed by two adults, one of whom continued in control until deposited in the post office.

**8. ADULTS.**

As the parties have made this a condition of the contract, we are not to inquire into its materiality. It is enough that they made it material. *Stewart v. Equitable Life Ass'n,* 110 Iowa, 528; *Nelson v. Nederland Life Ins. Co.,* 110 Iowa, 600. While two adults witnessed the packing and sealing of the money, Dato, who was also present, carried the package to the postmaster, and had it registered. He was seventeen years old, his next birthday being July 13, 1900; and on the way or at the building he met Gaxiola, a boy of fifteen years. Dato claims merely to have answered Gaxiola's question as to what was in the package, while Gaxiola testified that this information, together with the statement of the amount, was volunteered to him and one Henderson; that the latter climbed over the partition heretofore mentioned, and extracted the package from the mail sack, shortly after six o'clock p. m., and subsequently shared its contents with him. It may be, as argued by appellant, that this illustrates the reason for exacting the performance of duty, or of packing and delivering the money to the government by adults, because of their greater prudence. It is to be observed, however, that no condition of the policy imposes silence on one properly selected to carry the money. But was Dato an adult? At common law, according to Blackstone: "A male at the age of twelve years may take the oath of allegiance; at fourteen is at years of discretion, and therefore may consent or disagree to marriage, may choose his guardian, and, if his discretion can be actually proved, may make his testament of personal estate; at seventeen may be an executor; and at twenty-one is at his own disposal, and may alien his lands, goods, and chattels. A female also at seven years of age may

be betrothed or given in marriage; at nine is entitled to dower; at twelve is at years of maturity, and therefore may consent or disagree to marriage, and, if proved to have suf-·ficient discretion, may bequeath her personal estate; at fourteen is at years of discretion, and may choose a guardian; at seventeen may be an executrix; and at twenty-one may dispose of herself and her lands. So that full age in male or female is twenty-one years, which age is completed on the day preceding the anniversary of a person's birth, who till that time is an infant, and so styled in law." Thereafter they are adults. And this is the conclusion of the lexicographers and the courts generally concerning the term in its legal acceptation. Thus the Court of Appeals of Texas, in *Schenault v. State,* 10 Tex. App. 410, and numerous cases since, has defined the word to be a person who has attained the full age of twenty-one years. See, also, Code 3188. The common law is modified by our statute to the extent of declaring a female an adult at eighteen years of age, and all persons such upon marriage.

But the policy was issued to the plaintiff, a corporation located in the state of Sonora, in the republic of Mexico. The application therefor was mailed from Hermosillo, Mexico, and in response the policy was executed and mailed to plaintiff at that place. It is conditioned " to cover shipments by the registered mail or by express within the United States, or between the United States and the dominion of Canada, kingdom of Great Britain and Ireland or the continent of Europe." This package was merely registered from one point in the territory of Arizona to another, and, in the absence of any showing to the contrary, its laws, as contended, are to be presumed like those of Iowa. There is nothing in the contract, however, requiring the money to be packed and sealed in any of the countries named, and the fact that the policy was issued to a bank in Mexico indicates that this was to be done there. Naturally the money would be prepared for

*Margin note: 4. CONTRACTS: performance; enforcement; law governing.*

transportation before removal from the place where kept. This must have been within the contemplation of the parties in making the contract. Manifestly the object was to provide indemnity for loss between points in the countries enumerated in transporting funds from the plaintiff bank. The thought, then, was that the money would be prepared for shipment in Mexico. This portion of the contract was to be there performed, and in this respect it is well settled that the laws of the *locus in quo* govern. "Matters bearing upon the execution, the interpretation, and validity of a contract are determined by the law of the place where the contract is made. Matters connected with its performance are regulated by the law prevailing at the place of performance. Matters respecting the remedy, such as the bringing of suits, admissibility of the evidence, statutes of limitation, depend upon the law of the place where the suit is brought." *Scudder v. Union Nat. Bank,* 91 U. S. Rep. 406 (23 L. Ed. 245). To the same effect, see Wheaton on Conflict of Laws, section 201; Wharton on Conflict of Laws, section 433 *et seq.;* Minor on Conflict of Laws, section 186. In the absence of anything indicating the contrary, the parties are presumed to have in mind, for the purpose of performance, the law and usage of the place where this is to be done. This particular part of the contract was to be performed at the initial point by the plaintiff, and there is no reason for thinking the parties intended otherwise than the laws of Mexico should control. Frequently different parts of an arrangement are to be carried out in different localities, and ordinarily in such cases the law of the place is applicable to the doing of each part. Minor on Conflict of Laws, section 160. As, then, the money was intended to be packed and sealed in Mexico, and the persons doing this were to be adults, they were required to be adults under the law of that country.

The plaintiff pleaded that the " civil law, in distinction from the common law, is the foundation of the laws of Mexico." It called as witness an attorney who testified, in

substance, that he was not acquainted with the laws of the republic of Mexico, nor of the State of Sonora, but that he **5. FOREIGN LAWS: proof of same.** had been a student of history of law and government, and, from his studies, knew, in a general way, the countries having a civil law or a Justinian Code as the basis of their jurisprudence, and that Mexico was one of these; that the country had a constitution and statutory laws in system like those of the United States; and that Bouvier's Law Dictionary is accepted authority on legal definitions. The parts of this dictionary stating that the civil law is the foundation of the law of Mexico and certain other countries, and that an " adult, under the civil law, is a male infant who has attained the age of fourteen years," was introduced in evidence. All this evidence was received over the defendant's objection. That concerning the dictionary and its definition of an adult under the civil law was rightly admitted. Otherwise the witness did not show himself competent to testify. No evidence of the written law was introduced. The statute authorizes proof of the unwritten law of a foreign country by parol. Section 4657; *Crafts v. Clark,* 38 Iowa, 237. But this must be given by persons familiar with the laws of such country, or who are at least in a situation rendering such knowledge probable. *Watson v. Walker,* 23 N. H. 471; *American Life Ins., etc., Co. v. Rosenangle,* 77 Pa. 507; *Greasons v. Davis,* 9 Iowa, 219.

As to whether the civil law is the foundation of Mexican jurisprudence, the histories are quite as accessible to the **6. FOREIGN LAWS: judicial notice.** court as to the witnesses. Probably judicial notice should be taken of the fact as a matter of history. But this extends no farther than that the general system of jurisprudence prevails, without taking notice of details. The extent of its adoption we are not bound to know, for, in its adjustment to the situation and conditions of a people on this continent, doubtless many changes were made. Was the entire body of the Justinian Code adopted ? Or this with modifications essential to meet the necessities and

demands of modern civilization? This was a matter for specific proof with respect to the particular issue. We know that Mexico was a Spanish province for about three hundred years, and then became, and still is, a republic. At no period of its history has it been under British sovereignty. Its institutions are Latin, and not Anglo-Saxon, and the common law is not presumed to be in force in any State or country where English institutions have not been established. *Savage v. O'Neil,* 44 N. Y. 298; *Davison v. Gibson,* 56 Fed. Rep. 443 (5 C. C. A. 543); *Norris v. Harris,* 15 Cal. 252; *Flato v. Mulhall,* 72 Mo. 522; *Brown v. Wright,* 58 Ark. 20 (22 S. W. Rep. 1022, 21 L. R. A. 467, 13 Am. & Eng. Enc. of Law, 1065).

The appellee urges that the objection to the nonage of Dato was waived, and there is much to be said in favor of this proposition. But as what we have said will in all probability terminate the case, it is unnecessary to pass on that issue.—REVERSED.

BISHOP, J., took no part.