Thomas P. HUNT, Appellee,

v.

STATE of Iowa, Appellant.

No. 2-57891.

Supreme Court of Iowa.

April 20, 1977.

Richard C. Turner, Atty. Gen., John E. Beamer, Special Asst. Atty. Gen., and Fred M. Haskins, Asst. Atty. Gen., for appellant.

James R. Hamilton and C. Daniel Connell, Storm Lake, for appellee.

Heard by MOORE, C. J., and REES, REYNOLDSON, HARRIS and McCORMICK, JJ.

McCORMICK, Justice.

The State appeals adverse judgment in a tort claims suit. The questions are whether the evidence is sufficient to support the finding of negligence and whether the trial court erred in two rulings on evidence. We find no reversible error and affirm the trial court.

The action arose from a one-car accident on a frost-covered bridge on interstate 29 in Council Bluffs at about 6:20 a. m. on November 9, 1971. Plaintiff Thomas P. Hunt, then 20 years old, was driving north on the interstate. He was on his way from Omaha

to Missouri Valley to go duck hunting. He had the lights of his 1970 Plymouth on high beam and was traveling at approximately 50 miles per hour. It was nearly dawn. The weather was clear and calm.

Bridge 14 is located on a portion of the interstate which passes through the north part of Council Bluffs. At the time of the accident it served approximately 4000 vehicles a day. The bridge is elevated and banked, curving in a northeasterly direction. It is slightly more than two lanes wide for traffic in each direction, has a median, and is about 366 feet long.

After leaving Omaha, Hunt had not observed any unusual road surface conditions. The approach to the bridge was clear and dry. When Hunt got about two car lengths onto the bridge, his car started to slide. The rear of the vehicle slid to the right. Then it went out of control and overturned in the median. Hunt received massive permanent injuries, causing paralysis in the lower part of his body.

An investigating police officer also skidded on the bridge surface when he arrived at the scene of the accident. He observed that the bridge surface was icy and had not been sanded or salted. He saw that the south bound lanes of the bridge were also icy. The pavement and bridge approaches were free of ice.

This action was brought under the Tort Claims Act, Code chapter 25A. The statute provides for trial to the court at law. § 25A.4. After trial, the court entered its findings of fact, conclusions of law and judgment, holding for Hunt and awarding him damages of $501,750. In this appeal the State contends the court erred in finding the evidence sufficient to establish the State's negligence, in overruling an objection to the qualifications of a witness who expressed an opinion as to the probability of frost formation on the bridge, and in overruling an objection to admissibility of the consumer price index. The State does not challenge the amount of the judgment.

■ I. *Sufficiency of evidence of negligence.* The issue of negligence is ordinarily for the trier of fact. Only in exceptional cases may it be decided as a matter of law. The trial court's findings of fact in a case tried to the court at law have the force of a jury verdict. In our review, we view the evidence in its light most favorable to the judgment and construe the court's findings liberally to support the result. We need only consider evidence favorable to the successful party, even if it is contradicted by other evidence. *DeYarman v. State,* 226 N.W.2d 26, 27 (Iowa 1975); *Stanley v. State,* 197 N.W.2d 599, 604 (Iowa 1972). We recite the evidence herein with these principles in mind.

With exceptions not applicable here, the State is liable for its negligence "in the same manner, and to the same extent as a private individual under like circumstances. * * *." § 25A.4, The Code.

The State's duty to maintain its highways is statutory. § 313.36, The Code, 1971 ("Primary roads shall be maintained by the state highway commission * * *."); cf. §§ 313.36, 307.24, The Code, 1975.

■ This duty requires the State to exercise ordinary care to maintain its highways in a safe condition and to warn the traveling public of conditions which endanger travel, whether caused by a force of nature or by the act of third persons. *Ehlinger v. State,* 237 N.W.2d 784, 788–789 (Iowa 1976); *State v. Abbott,* 498 P.2d 712, 726 (Alaska 1972); Restatement (Second) of Torts § 349, comment b.

The fighting issue on the question of sufficiency of evidence of negligence in the present case is whether the State could reasonably be charged with constructive notice of the frost condition on bridge 14 and a reasonable opportunity to remedy it.

■■ The concept of constructive notice includes an obligation to make further investigation when from what is known an ordinary prudent person would recognize such necessity:

It is not necessary that the actor should realize that the circumstances surrounding him are such as to make his conduct likely to cause harm to another. It is

enough that he should realize that his perception of the surrounding circumstances is so imperfect that the safety or danger of his act depends on circumstances which at the moment he neither does nor can perceive. In such case it is negligent for him to act if a reasonable man would recognize the necessity of making further investigation. Restatement (Second) of Torts § 289, comment j.

Those who have the duty to maintain highways are required to make reasonable use of weather information to anticipate adverse road conditions:

> The duty of the public authority to use ordinary care in keeping its highways in a safe condition for public travel involves the anticipation of defects that are the natural and ordinary result of use and climatic influences, and it may be charged with constructive notice of their existence by reason of its failure so to anticipate them and its neglect to make sufficiently frequent and careful examinations or inspections to enable it to discover them. 39 Am.Jur.2d Highways, Streets, and Bridges § 419 at 819.

Hunt sought to meet his burden on the issue of constructive notice by introducing evidence that the State breached a procedure in its own highway maintenance manual which, if followed, would have disclosed a high probability of frost on the bridge in time for the State to have sanded or salted the bridge surface well before the accident.

The highway maintenance manual contains policies and procedures for use by department personnel in carrying out the State's responsibilities to the public in maintenance of state highways. It is a looseleaf publication in two volumes, periodically supplemented to reflect changes. At all times material here, the manual contained a statement of policy and procedure regarding frost on bridge floors. This statement was added to the manual January 1, 1965. It was part of the evidence in this case.

In its entirety, it provides:

> Quite often in the fall and spring, when the temperature drops to 32° or below, heavy frost will form on bridge floors. The reason for this is that the bridge floor cools down more rapidly than the pavement which is in contact with the ground. Frost usually occurs on nights when there is little or no wind.

Frosty bridge floors, when the pavement is normal, are a definite hazard to traffic as the driver will not be expecting or prepared for the slippery condition of the bridge floor. Therefore, frosty bridge floors must be treated with either salt or abrasives on the roads that are in the salt program or abrasives on other roads as soon as the frost appears.

In 1957 the U.S. Weather Bureau described the conditions under which frost would occur as follows:

"Dew or frost will usually occur on quiet nights with little or no wind, when the temperature of the air falls to the dew point. The latter is a computed figure and is the temperature at which the air would be saturated assuming a constant absolute humidity. The 32 degree temperature is taken as the dividing line between dew and frost.

On a clear night the loss of heat from a bridge floor is more rapid than from the pavement, since there is conduction of heat to the pavement from the ground. This means that the air in immediate contact with the bridge floor will reach the dew point earlier and dew or frost will be deposited sooner. Also the bridge is likely to be located in a relatively low area, with cold air draining slowly into the area. This accentuates the cooling process, with the bridge located in what is commonly called a 'frost pocket', an area where frost is more frequent than in surrounding areas.

With this in mind, I think that we can arrive at a few rules 'of thumb' which would be helpful in forecasting the occurrence of frosts on bridge floors. In the afternoon secure from the nearest Weather Bureau the forecast for the night and also the current dew point. In applying the temperature forecast to the bridge floor, lower the minimum temper-

ature expected six to eight degrees. Sometimes it would be even lower but that amount should suffice in most instances.

Rule: If little or no wind and no low clouds are forecast and the expected minimum temperature (at the bridge) is as low or lower than the dew point, and the dew point is below 32°, expect frost to form on the bridge floor".

If you are in the vicinity of a U.S. Weather Bureau station, in the afternoon obtain from [it] the dew point and forecast for temperatures and possibility of frost forming on bridges. If the dew point is 32° or lower and the forecast temperature less say 6° equals, or is lower than, the dew point there is likely to be frost on the bridge floors on a quiet night with little wind and no low clouds.

Where there is frost on bridge floors be sure to treat the bridge floors with salt or abrasives.

The State admittedly did not follow this procedure. We have held violation of such a procedure is evidence of negligence:

Pertinent portions of the maintenance manual of the Iowa State Highway Commission are in evidence. * * *. The violation of such a safety code is evidence of negligence. *Ehlinger v. State*, supra, 237 N.W.2d at 788.

The trial court based its finding of negligence in part on breach of this procedure in the present case.

■ Substantial evidence was adduced to show the procedure was applicable and was violated. In addition, substantial evidence was received supporting the trial court's finding that violation of the procedure was a proximate cause of Hunt's accident. If the maintenance personnel had used the procedure, they would have known of the probability of frost and could have taken timely measures to eliminate the danger. Availability of the procedure coupled with weather conditions favorable to frost gave the commission constructive notice of the hazard in time to guard against it or eliminate it.

The existence of the maintenance procedure is itself evidence the State knew frost conditions are predictable. Phillip Hassenstab, resident maintenance engineer for the highway commission at the time of the accident, testified he was familiar with the procedure, although he did not follow it.

Bridge 14 has greater propensity for frost formation than other bridges in the area because of its greater length, greater free span and greater elevation. Moreover, the fact that it is curved means frost constitutes a much greater hazard on it than on straight bridges.

Frost on bridges occurs about 20 days a year, mainly in the fall. As the maintenance procedure explains, it usually occurs on quiet nights with little or no wind when the temperature of the air falls to the dew point, the temperature at which the air reaches its maximum capacity to hold moisture. As air cools, its capacity to hold moisture decreases. When the dew point is reached, dew or frost results depending on the temperature. Because the bridge floor will cool faster than the pavement before the ground is frozen in the fall, frost will occur there sooner than on the roadway.

Under the procedure, a maintenance supervisor who is in the vicinity of a weather bureau station is to obtain from it the dew point and forecast. If the dew point is 32° or lower, if the forecast temperature, less six degrees, is lower than the dew point, and if there will be little wind and no low clouds, frost on bridge floors is likely.

In this case, the dew point and forecast were available from the weather station at Eppley airfield in Omaha, a little more than one mile from bridge 14. The dew point at about 4:00 p. m. was 37°; the temperature was then 42°. The forecast at 4:10 p. m. included the following:

Decreasing cloudiness with west to northwest winds 10 to 20 mph and diminishing tonight, locally cooler north portion. Lows low and mid 20s northwest, upper 20s to low 30s southeast.

A highly qualified meteorologist, Douglas N. Yarger, staff meteorologist at Iowa State University, testified that the 4:10 p.

m. forecast "indicates a very high probability of frost occurring during the times the forecast is in force," adding that the frost would occur between midnight and 7:00 a. m. He said a person following the manual procedure would be compelled to reach the same conclusion:

> So either from my meteorological experience or from following the instructions, we arrive at the same conclusion: the probability of frost would be high.

Another expert, transportation consultant George Brown, testified to the same effect. He said maintenance personnel should have followed the letter and spirit of the maintenance procedure. He also said bridge surfaces should be sanded when icing is anticipated.

Yarger and Brown said use of weather forecasts is a better method of protecting against the bridge frost hazard than random inspections. An inspection will only reveal whether frost is present at the time of observation; it will not help determine whether frost may be expected. Forecasting allows frost to be predicted and anticipatory measures to be taken. Records from the weather bureau of actual weather conditions during the night of November 8, 1971, showed it was probable frost existed on the surface of bridge 14 well before 6:20 a. m.

The State contends it is wasteful and sometimes hazardous to apply sand or salt to a dry roadway as a preventive measure. In response to this contention, witness Brown said the possibility of waste and slight reduction in the coefficient of friction from applying an abrasive on a dry surface when ice is expected is far outweighed by the efficiency of preventing the much greater hazard of ice. A State maintenance directive regarding the use of salt supports Brown's testimony. It provides, "The use of salt to prevent ice is recommended over waiting for ice to form before application even at the risk of the possibility that an occasional load may be wasted if conditions improve." The trial court could reasonably conclude the same reasoning is applicable to the use of abrasives such as sand, as asserted by Brown.

In contrast to this evidence, the State offered testimony of Hassenstab to show what procedure was actually followed. Weather forecasts were not used to predict the possibility of frost. The manual procedure was ignored. He depended entirely on random frost checks by maintenance employees. They did not make such visual inspections until after 6:00 a. m. during the frost season. During earlier hours Hassenstab depended on reports from law officers whom he had invited to inform him and his personnel in the event of emergency. Some evidence indicates this invitation may not have been accepted. The record shows the officer who investigated the Hunt accident did not notify maintenance personnel of the icy condition of the bridge on that occasion.

Although evidence was introduced by the State to show maintenance employees earned overtime on November 9, 1971, no evidence was offered that bridge 14 was inspected. The State also offered experts who differed with Hunt's experts.

In these circumstances the problem of resolving conflicting inferences was for the trier of fact. We hold the evidence was sufficient on the issue of the State's negligence. The trial court did not err in holding the State had constructive notice of the hazard and failed to use ordinary care to prevent or remove it. See *Ehlinger v. State,* 237 N.W.2d 784, 789 (Iowa 1976), and citations.

For additional authorities supporting this conclusion, see *State v. Abbott,* 498 P.2d 712 (Alaska 1972); *Citta v. State,* 35 A.D.2d 288, 316 N.Y.S.2d 105 (1970); *Fincher v. State,* 19 A.D.2d 762, 241 N.Y.S.2d 504 (1963); *McCracken v. Curwensville Borough,* 309 Pa. 98, 163 A. 217 (1932). Cases relied on by the State do not express different principles of liability and are factually distinguishable.

II. *The ruling on Brown's qualifications.* The State contends the trial court erred in overruling its objection to an opinion of George Brown regarding the likelihood of frost formation on bridge 14 at the time

involved here. Brown was asked if he had studied the weather forecast and the procedure in the commission manual. After affirmative response, he acknowledged he had an opinion on the possibility of frost formation. When he was asked for his opinion the State objected he was not qualified to give the opinion and a foundation showing his qualifications had not been established. The ruling admitting his opinion is now challenged on the same grounds.

General principles governing admissibility of expert opinion are well established and need not be repeated here. See *Ruden v. Hansen*, 206 N.W.2d 713, 717 (Iowa 1973), and citations; *Ganrud v. Smith*, 206 N.W.2d 311, 314–316 (Iowa 1973), and citations. The qualifications of Brown to testify on various subjects have been the issue in several of our cases on the subject. The specific principle involved here is that the issue of qualifications is relative to the topic about which the person is asked to make his statement. *Karr v. Samuelson, Inc.*, 176 N.W.2d 204, 210 (Iowa 1970).

■ Here Brown gave his occupation as transportation consultant. He said:

I have a bachelor's degree in metallurgy and general science, a master's degree in chemistry and metallurgy, and a Ph.D. degree in physiology.

My experience has been seventeen years on the faculty and administrator of research programs at the Veteran's Administration Hospital in Iowa City; in addition I have taught in the Department of Civil Engineering in Transportation from 1967 to '71, done research in accident analyses and in transportation accidents, reconstructed accidents at Wright-Patterson Air Force Base in 1949 and '50 and since 1966 with the automotive transportation primarily.

Brown testified extensively without objection regarding the characteristics of the bridge involved in the present case.

The procedure in the commission manual was expected to be understood and implemented by persons with much less education and experience than Brown. His background in general science alone should have

equipped him to understand the concepts and computations involved in arriving at the opinion he was permitted to express. It is not manifest that the trial court abused its wide discretion in admitting Brown's opinion.

This conclusion is made more secure by later testimony of Brown. He said he had made an extensive study of icing problems of bridge decks including bridge characteristics, icing circumstances and various remedial alternatives. Identification of weather conditions fostering frost formation was one of the subjects he researched. He testified in considerable detail regarding the principles of frost formation. His testimony was in accord with that of other witnesses on the subject.

The trial court did not err in overruling the State's objection to Brown's qualifications to predict frost using a weather forecast and the commission maintenance manual procedure.

III. *The ruling admitting the consumer price index.* The State also contends the trial court erred in overruling its objection on grounds of inadequate foundation and hearsay to Hunt's offer of a document containing the current consumer price index. The document was entitled "Survey of Business Statistics", a publication of the bureau of economic analysis of the United States Department of Commerce. The evidence was offered to show the effects of inflation relating to the issue of the amount of Hunt's damages. See *Schnebly v. Baker*, 217 N.W.2d 708, 727–728 (Iowa 1974).

■ The State's foundation objection was based on a contention the document was inadequately identified. It is true no witness was called to identify or authenticate it. This is the usual and often essential means of laying a foundation for introduction of an exhibit. See McCormick on Evidence § 51 at 109 (Second Ed. 1972). However, writings can sometimes be authenticated through other methods. *Id.*, Chapter 22. In addition, certain writings are self-authenticating. *Id.*, § 228 at 556–558. We think the document here is in the

latter category. It is an official government publication. Rule 902, Uniform Rules of Evidence (1974), drafted by the national conference of commissioners on uniform state laws, provides in relevant part:

> Extrinsic evidence of authenticity as a condition precedent to admissibility is not required with respect to the following:
>
> \* \* \* \* \* \*
>
> (5) Official publications. Books, pamphlets, or other publications issued by public authority.

We approve this provision. On this basis, the trial court did not err in overruling the State's foundation objection to the department of commerce publication offered here.

The hearsay objection raises a separate issue, but we think it is also answered by a provision in the Uniform Rules of Evidence, as well as precedent of this court. This issue is whether the consumer price index is admissible under an exception to the hearsay rule. Because the trial court overruled the State's hearsay objection, we will sustain the ruling if the hearsay rule can be found inapplicable here under any theory. *State v. Kidd*, 239 N.W.2d 860, 864 (Iowa 1976).

The Uniform Rules of Evidence include this provision in rule 803:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> \* \* \* \* \* \*
>
> (8) Public records and reports. \* \* records, reports, statements, or data compilations in any form of a public office or agency setting forth \* \* \* matters observed pursuant to duty imposed by law and as to which there was a duty to report, or factual findings resulting from an investigation made pursuant to authority granted by law. \* \* \*

The consumer price index measures average changes in prices of goods and services bought by urban wage earners and clerical workers, including families and single persons. It is prepared by the bureau of labor statistics, United States Department of Labor, "from extensive data collected on a national basis, systematized and published for general distribution, and kept as records of the bureau \* \* \*." *Cole v. Cole*, 532 S.W.2d 508, 510 (Mo.App.1975). The secretary of labor is required by law to "collect, collate, and report at least once each year \* \* \*" the information which comprises the index. 29 U.S.C. § 2.

Numerous federal statutory provisions use the consumer price index either to determine eligibility or calculate the amount of benefits. Included are determining cost of living increases in social security benefits, 42 U.S.C. § 415, adjusting retirement and retainer pay in the military, 10 U.S.C. § 1401a, adjusting cost of living increases in annuities of retired civil service workers, 5 U.S.C. § 8146a, and computing cost of living increases for retired foreign service workers, 22 U.S.C. § 1121. It is used to make changes in appropriations to states for child care food payments, 42 U.S.C. § 1766, school milk programs, 42 U.S.C. § 1772, and summer food programs for children in service institutions, 42 U.S.C. § 1758. It is also used to determine low income levels for purposes of comprehensive employment and training programs, 29 U.S.C. § 981, poverty levels, 42 U.S.C. § 297d, and changes in payment per meal in the nutrition program for the elderly, 42 U.S.C. § 3045f.

We believe the consumer price index is the kind of data compilation which comes within the hearsay exception provided in rule 803(8), Uniform Rules of Evidence. Moreover, we approve the exception. See *Cole v. Cole*, supra.

This hearsay exception is similar to those we have previously recognized involving official or standard compilations of data. See *Droullard v. Rudolph*, 207 Iowa 367, 223 N.W. 100 (1929) (life expectancy tables); *Wilbur v. Buckingham*, 153 Iowa 194, 132 N.W. 960 (1911) (standard price lists and market reports); *Banco De Sonora v. Bankers' Mut. Casualty Co.*, 124 Iowa 576, 100 N.W. 532 (1904) (a dictionary definition); *Nosler v. Chicago, B. & Q. R. Co.*, 73 Iowa 268, 34 N.W. 850 (1887) (maps); see § 622.-23, The Code; Wigmore, Code of Evidence, rule 165 at 314–315 (Third Ed. 1942).

The trial court did not err in overruling the State's objection to admissibility of the official government publication containing the consumer price index.

We find no merit in any of the State's assignments of error.

AFFIRMED.