Thelma W. KOEHLER et al., Appellants,

v.

STATE of Iowa, Appellee.

No. 59368.

Supreme Court of Iowa.

March 22, 1978.

E. W. Henke of Henke & Eggert, Charles City, for appellants.

Richard C. Turner, Atty. Gen., John E. Beamer, Sp. Asst. Atty. Gen., and Ralph F. McCartney of McCartney & Erb, Charles City, for appellee.

Considered by MOORE, C. J., and Le-GRAND, REYNOLDSON, HARRIS, and McCORMICK, JJ.

REYNOLDSON, Justice.

These four consolidated cases brought under the Iowa Tort Claims Act, Chapter 25A, The Code, arose when an auto collided with a snowbank following the historic blizzard of April, 1973. Trial to the district court sitting without a jury (§ 25A.4) resulted in judgment for defendant State of Iowa. Upon plaintiffs' appeals, we affirm.

I. *Factual findings.*

The issue of negligence is ordinarily for the trier of fact. Only in exceptional cases may it be decided as a matter of law. Trial court's fact-findings in a case tried to the court at law have the force of a jury verdict. Upon appeal we view the evidence in its light most favorable to the judgment and construe the court's findings liberally to support the result. We need only consider evidence favorable to the successful

party, even if it is contradicted by other evidence. *Hunt v. State*, 252 N.W.2d 715, 717 (Iowa 1977); *Ehlinger v. State*, 237 N.W.2d 784, 787 (Iowa 1976); rule 14(f)(1), Rules of Appellate Procedure.

From a study of the appendix and transcript we find there was substantial evidence to support the following findings of the trial court:

"On April 10, 1973, Harvey Koehler, age 60, at approximately 8:20 p. m., was driving his 1969 Chevrolet Impala at a speed of approximately 50 to 60 miles per hour in an easterly direction on Highway 14, in Floyd County, approaching Charles City, Iowa. His wife, Thelma, was a front seat passenger. His daughter, Elaine Wilson, a passenger in the left rear seat, and his son-in-law, Jerry Wilson, a passenger in the right rear seat. At approximately two and one-half miles west of Charles City, apparently without application of the brakes, Koehler's auto struck a snowdrift and then bounced into the path of a westbound auto driven by Eric J. Lien. The Koehler auto was struck broadside, resulting in the instantaneous death of Harvey Koehler, relatively minor injuries to Thelma Koehler, serious injuries to Elaine Wilson and near fatal injuries to Jerry Wilson, which required an extended and expensive period of medical treatment and hospitalization.

"This snowdrift was located near the farm residence of Bill Fluhrer, with a depth of four to five feet in places and was variously estimated to be from 130 feet to 500 feet in length. It covered the south half of the traveled portion of the highway and extended approximately one foot beyond the center line into the north half of the traveled portion of the highway. At this point, the highway was open to one-way traffic only. The traveled portion of Highway 14 was free of ice and snow at all places, except at the point of this drift.

\* \* \* \* \* \*

"The snowdrift involved was the aftermath of an unprecedented April storm in Floyd County, Iowa. It began on April 8, 1973 in the form of rain, changing to freezing rain, sleet, and ultimately to snow.

"Kenneth Horn, a thirty-year employee of the Department of Transportation, formerly the Iowa State Highway Commission, was on April 8, 1973 the supervisor of maintenance for the Iowa State Highway Commission. He was charged with snow removal from the primary highways situated in Floyd County, including Highway 218 from Nashua to Floyd, Highway 14 from Charles City to Greene, Highway 18 from Bassett to Nora Springs, Highway 54 situated between Highway 14 and Marble Rock, and Highway 147, situated between Highway 14 and Rockford. He was charged with removal of snow from approximately seventy miles of primary highway. He had equipment consisting of two heavy-duty, ten-ton, four-wheel-drive trucks; five two-ton trucks, and one road maintainer or grader. On April 8th, various of these units were sent out to sand and salt the primary highways.

"During the night of April 8th and the early morning of April 9th, the wind increased in velocity and a blizzard was in progress. Horn called in his crews at approximately 5:00 a. m. on April 9th, and sent the units out at approximately 6:00 a. m. to plow the highways. The wind increased in velocity and in late morning on April 9th, the trucks were called back for the reason they were making no progress in keeping the highways clear and that there was practically no visibility. In the meantime the road maintainer had been involved in an accident with a pickup truck and was disabled. It was towed to the park on Highway 14, approximately seven miles west of Charles City, and was abandoned during the period of the storm. All trucks arrived back at the Highway Commission shed in Charles City and V-plows were mounted on the two four-wheel-drive units and a small V-plow upon a two-ton truck. Chains were put on the trucks, except one four-wheel-drive unit equipped with snow tires which would not accommodate chains. This work was completed in the late evening of April 9, and the crew then attempted to get some rest, sleeping in the cabs of their trucks or upon benches or tables in the shed.

"By 1:30 a. m. on April 10th snow had stopped and the wind had subsided. Twelve inches of wet, heavy snow had fallen. The men were aroused and preparations made to begin clearing the highways.

"At approximately 3:00 o'clock a. m. all units proceeded south on Highway 218 toward Nashua, with the exception of one two-ton truck which remained in Charles City to plow the primary highways in Charles City. The road maintainer was still disabled. After clearing Highway 218, the units returned to Charles City at approximately 6:00 a. m. After breakfast, Burney, operating a two-ton truck with a small V-plow, and Wiltse, operating a two-ton truck with a straight blade, were dispatched to open Highway 14 from Charles City to Greene, with instructions to open it to one-way traffic. At the same time five units, including the two big four-wheel-drive units, were dispatched to open Highway 18 to Bassett, Iowa. These five units encountered considerable difficulty, for the reason that the east-west roads were drifted more severely than the north-south roads, and for the further reason that the snow was wet and heavy and difficult to move. They were delayed when Martin, driving one of the four-wheel-drive units, tore up his chains and they had to be replaced. Highway 18 to Bassett was finally opened to two-way traffic and the units returned to Charles City at approximately noon. These units were gassed up, and, with the exception of Dean's unit, were sent north and west on Highways 18 and 218. Dean driving one of the four-wheel units, was delayed while repairs were made to correct a gas leak. These units encountered no difficulty until they passed Floyd, and then there was heavy drifting west on Highway 18.

"In the meantime, Burney and Wiltse had opened Highway 14 from Charles City to Greene to one-way traffic. Burney and Wiltse then proceeded to Highway 54 to attempt to open it to Marble Rock. They encountered high drifts which Burney's small V-plow unit could not handle. They then proceeded to Highway 147 and began opening the road to Rockford.

"Between 2:00 and 2:30 p. m. Horn was advised that Burney was stuck in a snowdrift approximately three-quarters of a mile east of Rockford and that he had a broken axle. Wiltse was unable to pull him out of the drift. Dean had caught up with the rest of the units plowing out 18. They encountered severe drifts west of Rudd, Iowa, and received assistance from a Mason City plow. They succeeded in opening the road to Nora Springs at about 5:00 p. m. Thoman, with a two-ton truck with a straight blade, was told to go to 147 and pull out Burney's truck. In the meantime, Burney had been told to go into Charles City with Wiltse in Wiltse's truck and take a mechanic back to his truck. Wiltse took Burney into Charles City, plowing snow as he did so, and he made an attempt to plow the drift situated at Bill Fluhrer's farm. He had a two-ton truck with a straight blade which was ineffective against the drift. Wiltse and Burney returned to Burney's truck near Rockford with the mechanic. Thoman arrived with his truck and was unable to pull Burney's truck from the drift.

"After opening the road to Nora Springs, Horn sent Pettit with a two-ton truck and straight blade, to clean up Highways 18 and 218. He sent the two four-wheel-drive units and a two-ton unit to Highway 147 to complete the opening of the road to Rockford. These units went down T–38, which connects Highways 14 and 18. Horn had had no sleep since Sunday and returned home to rest, leaving Franke in charge of the snow removal.

"Martin and Dean and the other small unit proceeded to Highway 147. They pulled Burney's truck from the snowdrift and Thoman towed Burney's truck into Charles City. Martin and Dean then proceeded to open the road to Rockford, and then proceeded to Highway 54 to attempt to open the road to Marble Rock.

"Martin, driving a four-wheel-drive unit, again tore up his chains and his unit was ineffective against the high drifts on 54. At approximately 7:30 Franke and Thoman

took gas out to Martin and Dean. These two units of Martin and Dean were making little progress against the drifts. The men were exhausted, and at approximately 8:00 p. m. were told to return to Charles City. They had not succeeded in opening 54. Franke and Thoman returned to Charles City by way of Highway 14 and came upon the accident scene at the Fluhrer farm. Martin and Dean, each driving a four-wheel-drive unit came upon the scene shortly thereafter. After the autos involved in the collision had been removed, Dean cleared the snowdrift from the traveled portion of Highway 18.

"The evidence is undisputed that there were no signs posted by defendant warning of the existence of the snowdrift at the Fluhrer farm. On several occasions during the day of the accident, the local radio station in Charles City broadcast that Highway 14 was open to one-way traffic. The plaintiffs did not hear any of these broadcasts.

"Numerous persons had passed through the cut in this particular snowdrift during the afternoon and early evening, without incident.

"Horn testified, as did his superior, that the policy in opening roads after a snowstorm was to first open the primary roads to one-way traffic. The policy was to open the most heavily traveled roads first, and then move to those carrying less traffic. The purpose in first opening to one-way traffic was for the passage of emergency vehicles, such as ambulance and fire trucks.

"There was further evidence as to the policy of defendant relative to warning devices on snowdrifts. It is not the policy of the State of Iowa to place warning signs on snowdrifts for the reason that frequently there are changing conditions and warning signs are regarded as being ineffective. On many occasions high wind is involved and warning signs presently available are ineffective. It was further the policy of Iowa, and adjoining states, to utilize men to remove the snowdrifts, rather than to place warning signs upon them. Representatives from adjoining state highway commissions,

namely Minnesota, Wisconsin, Nebraska and South Dakota, testified that their policy was similar to that of the State of Iowa. The evidence is further undisputed that the Manual of Uniform Traffic Control Devices, adopted by most, if not all states, makes no provision for placing warning signs on or near snowdrifts.

\* \* \* \* \* \*

"Plaintiffs contend that Highway Commission vehicles passed through the area at the Fluhrer farm without attempting to remove the snowdrift. The court concludes that plaintiffs have failed to establish that any Highway Commission vehicles which passed the point in question were capable of removing this particular drift. The evidence clearly shows that those vehicles which were capable of removing the drift did not at any time pass the area involved prior to the collision, but were involved in plowing snowdrifts on Highways 18, 147 and 54."

Plaintiffs contend the evidence discloses trial court was wrong in finding the State not negligent when it failed to remove a snowdrift it knew was blocking over one-half of the traveled portion of highway 14, or in not posting warning devices near the obstruction. We briefly analyze the applicable law.

II. *Snow removal.*

The § 313.36 statutory duty imposed on the State to maintain its highways requires they be maintained in a safe condition and that the traveling public be warned of conditions which endanger travel, whether caused by a force of nature or by act of third persons. *Hunt v. State, supra,* 252 N.W.2d at 717; *Ehlinger v. State, supra,* 237 N.W.2d at 788–789.

Further, § 319.1, The Code, 1973, provided:

"The state highway commission and the board of supervisors shall cause all obstructions in highways \* \* \* to be removed."

"Obstruction" means an obstacle in the way, or an impediment or hinderance which

impedes, embarrasses, opposes or interferes with free passage along the highway. *Davis v. Pickerell*, 139 Iowa 186, 188, 117 N.W. 276, 277 (1908).

■ Thus construed, § 313.36 imposes a duty similar to that imposed on cities and towns by former § 389.12 and its predecessors (duty to keep streets in repair). *Ehlinger v. State, supra*, 237 N.W.2d at 788. Relative to that statute this court has said:

"This statute requires the city to exercise reasonable and ordinary care to maintain its streets in a safe condition for travel in the usual and ordinary modes of travel. However, a city is not required to keep its streets in a condition of absolute safety. It is only required to use ordinary and reasonable care to that end. It does not insure the safety of travelers upon its streets, nor is it required to foresee and provide against every possible accident. It must have actual notice of the dangerous condition of a street, or the condition must have existed for a sufficient time to enable the city to discover and repair the same, in the exercise of reasonable and ordinary care and diligence."—*Abraham v. Sioux City*, 218 Iowa 1068, 1070, 250 N.W. 461, 462 (1933)

See *Walker v. County of Coconino*, 12 Ariz. App. 547, 549, 473 P.2d 472, 474 (1970); 39 Am.Jur.2d, Highways, Streets and Bridges, § 506, pp. 906–907 (1968); 40 C.J.S. Highways § 258, pp. 304–305 (1944) ("The state * * * will be liable where a way is defective from the presence upon it of snow and ice in large quantities, negligently permitted to remain by the municipal authorities after the lapse of sufficient time to clear the way * * * .").

■ What is a reasonable length of time to remedy the condition depends on the facts and circumstances of each case and is generally a question for the jury. See *Hovden v. City of Decorah*, 261 Iowa 624, 627, 155 N.W.2d 534, 536 (1968).

In the wake of an unexpected and disastrous blizzard, the State's negligence cannot be made to turn on the presence of one unremoved snowdrift, even though it played a role in this tragedy.

■ Plaintiffs make no charge the State did not provide enough machinery or employees to cope with this emergency. If such issue were raised, there would be a companion question whether those decisions ordinarily should be subject to review in tort suits for damages. See *Amelchenko v. Freehold Borough*, 42 N.J. 541, 550–551, 201 A.2d 726, 730–731 (1964) ("The extent and quality of governmental service to be furnished is a basic governmental policy decision.").

Nor have plaintiffs questioned the reasonableness of the State's planning to cope with such emergencies. There is logic in the scheme to open first the primary highways for one-way traffic, with heaviest traveled roads receiving top priority. This permits passage of emergency vehicles (ambulances and fire fighting equipment), travelers in need of medical attention, and movement of necessary food, fuel and supplies.

Thus the issue before trial court was whether the State used reasonable and ordinary care in utilizing its established snow removal procedure in light of the particular situation with which it was faced. See *Porta v. State of Louisiana*, 242 So.2d 64, 67–68 (La.App.1970); *Amelchenko v. Freehold Borough, supra*, 42 N.J. at 551, 201 A.2d at 731.

■ We find there was substantial evidence to support trial court's determination there was no negligence in permitting the snowdrift in question to remain on a portion of highway 14 when other highways remained unopened despite continuing dedicated efforts by State employees.

### III. *Warning devices.*

■ Ordinarily the State has a duty to place proper barriers, railings, guards and danger signals at obstructions and dangerous places on a highway, when necessary for travelers' safety. See *Hunt v. State, supra*, 252 N.W.2d at 717; *Stanley v. State*, 197 N.W.2d 599, 605 (Iowa 1972); 40 C.J.S. Highways, § 262, pp. 306–309; cf. *Anderson v. Lyon County*, 206 N.W.2d 719, 722 (Iowa

1973). Performance of that duty is measured by a reasonableness standard in light of the totality of circumstances. See *Ehlinger, supra,* 237 N.W.2d at 788; *Amelchenko v. Freehold Borough, supra,* 42 N.J. at 550–551, 201 A.2d at 730–731.

Failure to "sign" this snowdrift must be judged in context of the total situation then confronting the State through its employees. They could try to open the highways to one-way traffic or pull employees off that duty to place their limited number of warning devices on selected snowdrifts.

■ Again, there is involved the ordering of priorities, and policy decisions in pre-planning for emergencies vis-a-vis the 20–20 vision of hindsight. The fact-findings of trial court set out above are supported by the record, and its conclusion the State was not negligent in failing to "sign" this snowdrift in the circumstances then prevailing was justified.

We affirm the judgment below.

AFFIRMED.