**Carl Francis EHLINGER, Appellee, Cross-Appellant,**

v.

**STATE of Iowa, Appellant, Cross-Appellee.**

No. 2–56965.

Supreme Court of Iowa.

Jan. 21, 1976.

Richard C. Turner, Atty. Gen., John E. Beamer, Sp. Asst. Atty. Gen., and Larry M. Blumberg, Asst. Atty. Gen., for appellant, cross-appellee.

David Hughes, Cascade, and William C. Fuerste, Fuerste, Carew & Coyle, Dubuque, for appellee, cross-appellant.

Heard by MOORE, C. J., and RAWLINGS, REES, UHLENHOPP, and REYNOLDSON, JJ.

REYNOLDSON, Justice.

The State, appealing from a tort-claim judgment awarding plaintiff $638,000 for personal injuries, raises issues relating to negligence, contributory negligence and proximate cause. Plaintiff cross-appeals, asserting the award was inadequate and demanding the case be remanded to district court for additur. We affirm on both appeals.

About noon on Saturday, June 7, 1969, the day after his high school graduation, plaintiff was picked up at his Cascade home by a friend, Patrick Howard. The afternoon was filled with a variety of activities which have no apparent relevancy to this appeal.

After eating at a Cascade cafe these boys started for Dubuque at about 6:45 or 7:00 P.M. in Howard's 1966 Ford Mustang. It was then raining hard. Howard drove east on highway 151. The rain let up. About three miles from Cascade Howard observed a pond of water on the highway at the bottom of a decline. He slowed his car from approximately 60 to 45 miles per hour. Howard testified he "hit a lot more water than I thought I was going to." When his car hit the water he lost control, the car was pulled to the right and off the roadway. After hitting a spillway the vehicle skidded into a farmyard and struck a tractor with its passenger side, injuring plaintiff.

The condition of highway 151 at and near the accident scene is of major importance. The highway was constructed in 1929 or 1930. It was the old style paved slab with a three-inch curb on each side included within its 18 foot width. The curb was designed to carry surface water along the outer road surfaces to spillways which drained it into the grader ditches.

By 1967 the roadway was so deteriorated the highway commission reduced the speed limit from 70 to 60 miles per hour. After construction of an improved road in 1970 this segment of 151 was closed to through traffic.

The road in the area of this accident lies in a swale. In this lower area was a culvert over which the pavement had settled. Some distance east of this culvert were spillways to drain water from the pavement to the grader ditches. But west of the spillways was a "frost heave" or "frost boil", an elevated portion of broken pavement which extended the width of the road and served as a dam to pool water in the depressed pavement before it could reach the spillways.

The district maintenance engineer testified he knew the frost heave had existed since 1962, and the condition was never corrected. The average daily traffic count was 2230 vehicles.

Krogmann, a highway commission maintenance worker, testified the frost heave would pond water coming down the pavement from the west to a depth of four inches, the water was a traffic hazard, and although he had reported it he received no authority to correct the situation. He saw signs where cars had gone off the roadway and through the fence at this location two or three times a year for some years before this accident. The water would lay in the pool until splashed out by traffic. The effort of the maintenance crews was to make the "heave" or bump less precipitous, not to correct the ponding problem or fill or drain the pond.

The ponding effect and occurrence of prior accidents was verified by farm owners living near the area, and persons involved in some of the mishaps.

The State's expert witness was Charles Huisman, maintenance area engineer for the highway commission. He testified on cross-examination the design of highway 151 would have contemplated that the water would be moved off the highway at let-down structures as frequently as required to keep it moving and not standing on the highway; by the end of the 1960's it was well known that extreme vigilance should be used to avoid conditions which

would tend to pool water on the roadway. Huisman described the phenomenon of "hydroplaning" in which, under certain conditions, a film of liquid will lift vehicle tires off the road surface, causing loss of control. One of the conditions or factors causing hydroplaning is the length of the "skin" of water lying over a smooth surface. He theorized Howard's car left the pavement because "hydroplaning probably was in effect back this way; either partially or totally, and that as they came into this pond area that you call it, that the additional resistance there or the plowing effect would have a tendency, in hydroplaning, for the vehicle to drift or veer to the right * * *."

The Iowa state highway commission maintenance manual provided, "If the settled pavement ponds water a temporary solution would be to cut a drainage way through the shoulder, if practical, or fill the depression with an asphalt premix. The area should then be raised with a mud jack as soon as the equipment is available." Huisman testified in this instance a short-term corrective measure would be to level the area with an asphaltic concrete material. This could have been done quickly before June 1969 at a cost of $250 to $500. Mud-jacking, in his opinion, would not have been practical because the pavement was too disintegrated. Assuming a settlement and frost heave creating a ponding situation, the witness stated the commission manual procedure called for an employee to report it to his supervisor as soon as possible, and an investigation and corrective procedures to be taken "[a]s soon as possible, and if a correction cannot be made immediately, proper warning by flags and/or signs would be placed." The condition should not exist with signs over more than a temporary period, "[s]ay a matter of days; 30 days; a month."

For several years the hazard at this location had been marked by "bump" signs topped by red warning flags, positioned to the east and west of the frost heave.

The highway patrol officer who arrived at the accident scene at 9:09 P.M. was a witness. The east edge of the water then collected on the highway was 45 feet west of the spillway. It extended to the middle of the road "or thereabouts." He estimated it to be four or five inches deep. There was nothing in his notes to indicate water was running out of the spillway at the time. This officer regarded the pond as a hazard to vehicles coming east. He testified without objection the accident was caused by a combination of speed and the amount of water on the highway.

Summarized, the issues presented by these appeals are 1) Was the State negligent in failing to repair the hazard? 2) Was plaintiff contributorily negligent? 3) Was the driver's negligence the sole proximate cause of the accident? 4) Was the award so inadequate it fails to do substantial justice?

I. *Scope of review.*

In these tort claims act cases the statute provides the district court, sitting without a jury, shall determine the facts. Section 25A.4, The Code.

■ Our usual rules relating to scope of review apply. The above factual recital follows the principle that the evidence is viewed in the light most favorable to the judgment, and trial court's findings are construed liberally to support the result reached. *DeYarman v. State,* 226 N.W.2d 26, 27 (Iowa 1975); see rule 344(f)(1), Rules of Civil Procedure. We need only consider evidence favorable to appellee whether or not it is contradicted. *Meade v. Roller,* 212 N.W.2d 426, 429 (Iowa 1973).

■ Negligence, contributory negligence and proximate cause are matters to be determined by the trier of fact and only in exceptional cases may they be settled as questions of law. Rule 344(f)(10), R.C.P.; *Ruan Transport Corporation v. Jacobs,* 216 N.W.2d 182, 185 (Iowa 1974).

These rules, impartially applied in tort claims act appeals, have supported judgment for the State, *DeYarman v. State,* supra, as well as for the claimant, *Stanley v. State,* 197 N.W.2d 599, 604 (Iowa 1972).

## II. *Issue of the State's negligence.*

Trial court found the frost heave and depression pooled water, which constituted a "chronic hazard", and no effort had been made to correct the depression. It concluded the State's employees were negligent in not filling up the ponding area with layers of asphaltic concrete or repairing the area in some other manner in accordance with the highway commission maintenance manual. It also concluded the "posting of a sign, does not, in itself, remedy a hazard in the highway, at least insofar as the same constitutes a hazard to those persons, such as the Plaintiff, who are not charged with control of the motor vehicle or observation of highway signs."

The State challenges this rationale, asserting it could satisfy any duty it might have by either repairing or warning, and in any event a warning was of no consequence to a passenger who had knowledge of the hazard and appreciated the risk.

It is plain the State's failure to repair highway 151 at the place of this accident violated state law, the highway commission's maintenance manual, and the commission's established procedure.

■ Section 313.36, The Code, 1966 provided "Primary roads shall be maintained by the state highway commission and the cost thereof paid out of the primary road fund. * * *" As used in this context "maintain" means "to keep in a certain condition or position, esp. of efficiency, good repair, etc.; preserve [to *maintain* roads]." Webster's New World Dictionary, p. 854. The duty of governmental bodies to "maintain" streets or highways is ordinarily held to include the duty to repair. *Clay v. City of Los Angeles,* 21 Cal.App.3d 577, 585, 98 Cal.Rptr. 582, 586 (1972); *Weiher v. Phillips,* 103 Ohio St. 249, 254, 133 N.E. 67, 68 (1921); *McClung v. King County,* 119 Wash. 14, 18–19, 204 P. 1064, 1065 (1922), aff'd, 123 Wash. 702, 212 P. 144 (1923); see *Engman v. City of Des Moines,* 255 Iowa 1039, 1042, 125 N.W.2d 235, 237 (1963); *Smith v. City of Algona,* 232 Iowa 362, 5 N.W.2d 625 (1942); *Delarosa v. State,* 21 Ariz.App. 263, 265, 518 P.2d 582, 584 (1974).

Thus construed, § 313.36 imposed a duty similar to that imposed upon cities and towns by former § 389.12 and its predecessors (duty to keep streets in repair):

> "This statute requires the city to exercise reasonable and ordinary care to maintain its streets in a safe condition for travel in the usual and ordinary modes of travel. However, a city is not required to keep its streets in a condition of absolute safety. It is only required to use ordinary and reasonable care to that end. It does not insure the safety of travelers upon its streets, nor is it required to foresee and provide against every possible accident. It must have actual notice of the dangerous condition of a street, or the condition must have existed for a sufficient time to enable the city to discover and repair the same, in the exercise of reasonable and ordinary care and diligence."

—*Abraham v. Sioux City,* 218 Iowa 1068, 1070, 250 N.W. 461, 462 (1933).

See *Engman v. City of Des Moines,* supra, 255 Iowa at 1042, 125 N.W.2d at 237; *Pietz v. City of Oskaloosa,* 250 Iowa 374, 377, 92 N.W.2d 577, 579 (1958); *Delarosa v. State,* supra, 21 Ariz.App. at 265, 518 P.2d at 584.

Pertinent portions of the maintenance manual of the Iowa State Highway Commission are in evidence. The manual specified the condition existing here should be repaired; no alternative of "signing" was specified. The violation of such a safety code is evidence of negligence. *Jorgenson v. Horton,* 206 N.W.2d 100, 103 (Iowa 1973); *Anderson v. Lyon County,* 206 N.W.2d 719, 722 (Iowa 1973).

Finally, the neglect to repair in this case was contrary to the commission's own procedures which required reporting, investiga-

tion and repair as soon as possible, with appropriate warning signs if the repair could not be made immediately.

■ Neither the statute, the commission's manual, nor its procedure support the State's argument that the posting of a "bump" sign in the vicinity of this hazard excused its duty to repair.

Nor are we able to discern how *Hampton v. State Highway Commission,* 209 Kan. 565, 498 P.2d 236 (1972), relied on by the State, supports its contention that if it warns, it need not repair. While the decision indicates, 209 Kan. at 573, 498 P.2d at 244, the jury was instructed the State had a "duty to eliminate the hazard or to warn the public of its presence, or to barricade the way," no warning was given, and whether a warning alone would suffice was not a fighting issue.

The following observation by the *Hampton* court more nearly supports plaintiff's position:

"[W]hen experience shows that a particular portion is notorious for collecting water and that the accumulation has repeatedly proven hazardous, it becomes incumbent on the commission to take some remedial action. Improving the drainage is one possibility; if that is not feasible, some type of warning is the least that is owed to the unwary highway user."

—209 Kan. at 573, 498 P.2d at 245.

This court also intimated it would reject an argument that warnings alone are sufficient when it said in *Hovden v. City of Decorah,* 261 Iowa 624, 627, 155 N.W.2d 534, 536 (1968):

"The length of time sufficient to constitute constructive notice of the condition *and a reasonable opportunity to remedy it* depends on the facts and circumstances of each case and is generally a question for the jury." (Emphasis supplied.)

Nonetheless, the State asserts it had no duty toward plaintiff who had knowledge of the hazard and appreciated the risk.

This argument ignores the record. Although plaintiff knew about the frost heave, there is no evidence he realized it pooled water or created a water hazard at this location.

■ The State encounters a second obstacle when it attempts to apply the general rule that a possessor of property is not obligated to eliminate known and obvious dangers, citing *Weidenhaft v. Shoppers Fair of Des Moines, Inc.,* 165 N.W.2d 756 (Iowa 1969); *Hanson v. Town and Country Shopping Center, Inc.,* 259 Iowa 542, 144 N.W.2d 870 (1966) and similar decisions. Of course that rule where applicable is subject to refinements and exceptions, *Frantz v. Knights of Columbus,* 205 N.W.2d 705 (Iowa 1973). More importantly, the concept embodied in the rule was never applied to the city's mandatory duty to keep its thoroughfares and public places safe for the public use they were designed to serve. *Fetters v. City of Des Moines,* 260 Iowa 490, 498, 149 N.W.2d 815, 820 (1967); *Lindstrom v. Mason City,* 256 Iowa 83, 91–92, 126 N.W.2d 292, 297 (1964). Neither should it be applied to negate the State's obligation to maintain primary roads. Section 313.36, The Code, 1966.

The statements in § 25A.2(5) and § 25A.4 making the State liable for employees' torts to the same extent as private individuals under like circumstances were designed to break through encrustations of governmental immunity, not to abrogate statutory duties elsewhere imposed. Compare § 25A.14(1) (State not liable where employee exercises due care "in the execution of a statute or regulation.")

■ We cannot say as a matter of law trial court was wrong in finding negligence on the part of the State's employees who failed to eliminate this hazard on highway 151.

III. *Issue of plaintiff's contributory negligence.*

Trial court found the State had not carried its burden of proving plaintiff was

negligent in performance of his duties as a passenger in Howard's vehicle (§ 619.17, The Code) "and no evidence thereon has been introduced."

The record discloses both plaintiff and Howard knew of the frost heave. Howard may have known of its capacity to pool water in the area of the accident. There was no evidence either knew or appreciated the extent of the hazard or the effect the water would exert on the car.

■ The lower court found Howard was negligent. But plaintiff had no right to control the car or Howard and the latter's negligence cannot be imputed to him. *Glandon v. Fiala,* 261 Iowa 750, 754, 156 N.W.2d 327, 330 (1968); see *Everhard v. Thompson,* Iowa, 202 N.W.2d 58, 59–60 (1973).

Plaintiff had no recall of events leading up to the accident. This was not unusual in view of the skull fracture he sustained and his subsequent long period of unconsciousness. The State wholly failed to question Howard regarding plaintiff's statements (if any) or conduct in the several minutes these parties traveled from Cascade to the point Howard lost control of his auto.

Respecting an automobile passenger's duty, we have said:

"A passenger in an automobile is not under an absolute duty to see an impending danger in time to interfere and prevent it. Within reasonable limits plaintiff had a right to rely upon the skill and judgment of the driver. She was not required to exercise the same degree of vigilance in looking and listening required of the driver."

—*Glandon v. Fiala,* supra, 261 Iowa at 755, 156 N.W.2d at 331.

See *Puhrmann v. Lund,* 254 Iowa 304, 308, 117 N.W.2d 495, 497 (1962); *Mathews v. Beyer,* 254 Iowa 52, 58–59, 116 N.W.2d 477, 481 (1962).

■ Trial court rightly held the State did not carry its burden of proof on the issue of plaintiff's negligence.

## IV. *Issue of proximate cause.*

■ Although trial court held Howard (the driver) was negligent, it determined his negligence was not the sole proximate cause of the collision. It found the "chronic hazard" which the State's employees negligently failed to eliminate was also a proximate cause.

But the State argues the operator's negligence was the sole proximate cause, asserting he "knew the road like he knew the back of his hand; he knew the bump was there; that water collected there in heavy rains, and the heavier the rain the more water at that spot; that there was bump sign and flags; that the area was dangerous and he always slowed down so he wouldn't have an accident  *  *  *."

Assuming the factual accuracy of this rationale, at most it goes only to the issue of the driver's negligence. It is ineffective as a device to impute negligence to plaintiff. It is still less relevant to the issue of proximate cause. As we noted in *Stanley,* supra, 197 N.W.2d at 605, such arguments are more appropriately directed to the trier of fact, not to this court as a basis for determining proximate cause as a matter of law.

Nor under this record may we determine, as a matter of law, the State's negligence was not a proximate cause on the basis of its theory water may have pooled on the road because the spillways were overloaded. There was ample evidence upon which trial court could have reached its conclusion this cause only augmented an "already existing and culpable hazard." Trial court could have found if the depression had been filled the water would have been shallower and would have escaped from the paved slab earlier. Elimination of the frost heave would have removed a barrier which pooled water 45 feet west of its designed outlet and even in heavy rain probably created a longer pool to traverse.

We find no reason to interfere with trial court's finding and conclusion there were

two proximate causes contributing to this accident.

### V. *Issue of damages.*

In the June 7, 1969 collision with the tractor, plaintiff sustained a skull fracture and fractures to the fourth and fifth cervical vertebrae with permanent and total injury to the spinal cord at that level. His paralysis and loss of sensation is now total and permanent below a line drawn through his body midway between shoulder and elbow. Weakened muscles still viable permit him to raise his forearm from the elbow, but he cannot lower it, nor does he have any control of his hands and fingers. He has no control over bowel and bladder functions, and of course none over his lower extremities.

Plaintiff was transferred to Iowa University Hospital as soon as a Dubuque doctor ascertained his injuries. Traction was applied to his head and neck until sometime in August 1969. September 8, 1969 he was transferred to Younkers Rehabilitation Center in Des Moines where he remained until June 11, 1970 with the exception of brief holiday visits at his parents' home. After remaining at home until October 1970 he was again at the rehabilitation center for six weeks. During these hospitalizations, surgery was performed to insert a catheter (which requires daily attention) into his bladder through his lower abdomen and to remove from the pelvis bones causing pressure bedsores.

At time of trial plaintiff was residing in a Cedar Rapids nursing home and attending Mount Mercy College. He is transported in a modified van equipped with a hydraulic lift platform and driven by another. By shoulder movements he can type using a pencil fastened to one hand, if someone else inserts the paper. He is capable of eating some foods using a special device strapped to his hand. He operates an electric wheelchair but cannot open a door or use a telephone. Plaintiff wears a corset to provide stability and support to his abdominal viscera and blood vessels. His diminished breathing capacity and inability to cough properly increase the hazards of pneumonia and require precautions, including higher room temperatures. He wears elastic support stockings to help prevent a recurrence of the thrombophlebitis he has already sustained. Plaintiff's doctor opined it was unlikely he would ever be self-supporting.

The State stipulated plaintiff's accident-related drug and dental bills from January 1970 through June of 1973 were $5195.14; his other medical bills through July 1972 were $33,779.56, and the value of his nursing care is $30 per day and increasing eight percent per year. His doctor estimated his future medical expense for routine examinations, suppositories, catheters, and medications would total $1000 per year in the future. His life expectancy as shown by the commissioners standard ordinary mortality table is 48.55 years.

Plaintiff's economic expert testified in his opinion the present value of the sum a 22-year-old Caucasian with two years of college would receive from future employment would be $1,615,916; the present value of plaintiff's future nursing care for 48 years would be $525,600.

Trial court awarded plaintiff $638,000 damages for "physical disabilities, mental pain and suffering, physical pain and suffering, loss of income, medical, hospital and nursing expenses and the pleasures of normal bodily function * * *."

Part of the discrepancy between plaintiff's evidence and the court's award is explained by trial court's finding that "[p]laintiff had just graduated from high school in the bottom quarter of his class * * * had never had regular employment; had no plans to go on to college; spent most of his weekends in drinking bouts with his friend Howard; and, expected to go to work for the Town of Cascade in street maintenance on the Monday following the accident. * * * There is nothing

to indicate that, prior to his injury, plaintiff would ever achieve even median earnings at any point during his lifetime, much less have such earnings every year of his remaining lifetime."

■ Plaintiff argues he was penalized because the court failed to distinguish between loss of earnings and the destruction of earning capacity to which his evidence was directed, citing *Anthes v. Anthes,* 258 Iowa 260, 270, 139 N.W.2d 201, 208 (1965); see *Schnebly v. Baker,* 217 N.W.2d 708, 726 (Iowa 1974); *Carradus v. Linge,* 203 N.W.2d 565, 568–569 (Iowa 1973). Despite the terminology used, it is plain to us trial court was referring to and considering loss of earning capacity. There is no requirement such loss need be measured in a vacuum: ordinarily considered are plaintiff's poor health, education and opportunity for education, age, intelligence, industriousness, manner of living, sobriety or temperance, frugality or lavishness or other personal characteristics which affect ability to secure business or earn money. See *Schnebly v. Baker,* supra, 217 N.W.2d at 725; *Schmitt v. Jenkins Truck Lines, Inc.,* 170 N.W.2d 632, 655 (Iowa 1969); *Anthes v. Anthes,* supra, 258 Iowa at 270–271, 139 N.W.2d at 208.

Plaintiff's medical expert was unwilling to speculate that quadriplegic patients live out a normal life expectancy. He testified plaintiff had not only suffered from bedsores requiring surgery, but incurred thrombophlebitis, a condition of blood clots in leg veins which can be fatal if the clots break off and get to the lungs. It was his observation such patients develop complications which may be in the form of a spastic condition, bladder stones, pneumonia, and kidney problems which are frequently fatal if not properly treated.

■ Thus trial court could have properly concluded that because of his severe injuries plaintiff would not live out his 48.55 year life expectancy. Thus far we have

followed the minority rule that shortened life expectancy caused by the injury may be used to reduce damages when determining loss of earning capacity. *Hughes v. Chicago, R. I. & P. Ry. Co.,* 150 Iowa 232, 238, 129 N.W. 956, 958 (1911); see *Schnebly v. Baker,* supra, 217 N.W.2d at 725; 2 Harper & James, The Law of Torts § 25.8 n. 6 (1956); 22 Am.Jur.2d, Damages § 92 n. 14, p. 135; I Iowa State Bar Association, Uniform Jury Instructions, instruction 3.16a. Of course a shortened life expectancy may also be considered when determining future pain, suffering, nursing and medical expense. See *Scott v. Chicago, R. I. & P. R. Co.,* 160 Iowa 306, 319–320, 141 N.W. 1065, 1071 (1913).

■ Trial court was not bound to follow the economist's expert testimony. *Weisbrod v. State,* 193 N.W.2d 125, 128 (Iowa 1971). Expert testimony may be used as an aid to the trier of facts, and may be adopted in whole, in part or not at all. *Iowa Development Company v. Iowa State Highway Com'n,* 255 Iowa 292, 300, 122 N.W.2d 323, 328 (1963).

■ Applying the criteria articulated in *Frantz,* supra, 205 N.W.2d at 712, we find no basis to interfere with the district court's award.

No reversible error in trial court's findings, conclusion and judgment has been disclosed by the State on appeal or plaintiff on cross-appeal.

Affirmed.