Robert K. MENZEL and Janet R. Menzel, Appellants,

v.

Michael J. MORSE and Dave Jones, d/b/a Dave Jones Realty, Appellees.

No. 83–869.

Supreme Court of Iowa.

Feb. 13, 1985.

Jerry C. Estes of Estes Law Offices, Fort Dodge, for appellants.

Dan T. McGrevey, Fort Dodge, for appellees.

REYNOLDSON, Chief Justice.

Plaintiffs Robert K. Menzel and Janet R. Menzel appeal from a district court judgment denying them damages in a malpractice action against the salesman, Michael J. Morse, and the broker, Dave Jones, who were involved in their purchase of a home. We reverse and remand.

The evidence that is relevant to the issues raised in this appeal is as follows: In 1978 plaintiff Robert K. Menzel purchased a one-half interest in Crocker Claims Service in Fort Dodge. In August 1978 the Menzels traveled from their Mason City home to the Crocker Claims office in Fort Dodge. Defendant real estate salesman Michael Morse, an agent for defendant broker Dave Jones, had an office in the same building. Learning the Menzels were moving to Fort Dodge, he sought them out. He later testified, "I hoped to make [Robert Menzel] my customer," and that he told them "we were one of the leading realtors in the community." Robert testified without contradiction that Morse stated "he would like to be our realtor and find a house for us." Both Robert and Janet testified that from that time forward they considered Morse their agent, to be compensated by the seller out of the money they paid for a home if they purchased as a result of Morse's services. Morse testified he never at any time told the Menzels that they "were not [his] clients," nor could he remember ever telling them he was working for or in behalf of any seller.

Robert and Janet again returned to Fort Dodge on August 15 and 26, 1978, and looked at some houses with Morse. On the morning of the 26th they spent about fifteen minutes examining a house under construction by Baker & Schorrer Construction Company. This home was about 80 percent completed, and was multiple-listed with Joe Brown Realty. Following lunch, Robert and Janet looked at the structure again for fifteen minutes, and decided to make an offer on it.

Morse prepared the offer form and counseled Menzels to offer the list price, which he said was the customary practice with new housing. Robert and Janet offered the asking price, $78,500, but on the condition that substantial improvements be added. Baker & Schorrer rejected this offer, countering with an offer to sell for $76,500 with the utility and laundry room to be finished. In the absence of Robert and Janet, Morse drafted another "Offer to Purchase and Acceptance" containing these terms, and signed it "By agent Michael Morse for Robert & Jan Menzel." The sellers signed this instrument, which provided that all necessary work ("to be of good professional caliber and subject to pre-closing inspection") was to be completed by the closing date, November 1, 1978.

Robert and Janet planned to inspect the house on November 1 and then go to the bank to close the deal. When they arrived at Morse's office, they were informed the closing time had been moved up. This left only about fifteen minutes to inspect the house. Robert and Janet, who had no experience with construction or new homes, found so many obvious construction defects they refused to close. Although Morse did not point out construction errors, he agreed there were problems, and later did not dispute the testimony of Robert and Janet that he assured them that "everything [would] be taken care of."

At trial Robert and Janet also testified Morse told them if they failed to close they would lose their $2000 down payment and in all likelihood would have a suit filed against them for breach of contract.

A meeting at the house was arranged for November 2, to be attended by Robert, Morse, a banker, a listing agent from Joe Brown Realty, and the contractors. Before that meeting, Robert and Morse discussed the situation in the latter's office. Robert testified he then stated he should have an attorney to protect his interest, but Morse advised him he did not need an attorney, that if "we had an attorney, and we didn't get that house [deal] closed, we would lose our $2000 and in all likelihood be subjected to a suit for nonperformance or breach of contract."

Morse's trial recollection of this discussion was as follows:

Q. Well, was this something that you told him? A. I did not tell him he would lose his earnest money. I told him that ... was one of the possibilities.

Q. And also it was possible he would be sued? A. Yes. I was merely re-paraphrasing in regards to the suit, paragraph 15 of this exhibit.

Q. Well, Mr. Morse, did you advise him to get a lawyer after you saw all these bad things at the house? A. No. It was not my position to advise him to get an attorney. I was representing the seller.

At a later point in his testimony Morse again referred to this meeting:

And [Robert] said he thought he should call an attorney. And I suggested he wait a minute on that. And I told him what his alternatives were, set forth in the offer, paragraph 15, sections a, b and c, and also informed him of the possibility that there may be a forfeiture of the earnest money if that was to be the case. At that point in time our appointment was arranged to look at the house. And the whole gist of it was that this was not the time to call the attorney. We had to go back out and see what could be done.

Although Morse's reference was to a provision on the back of the contract, essentially providing the buyer could rescind on the seller's default, Morse thereafter testified:

Q. Mr. Morse, you never told these two people that they could rescind or get out of this transaction, did you? A. I don't believe I did. I didn't know that they could. We had a signed agreement.

Robert testified that after the discussion in Morse's office, he felt he had no choice but to go through with the closing. He and Morse proceeded to the meeting at the house. After waiting outside for the contractors, who never appeared, those present inspected the house for a short time. Robert pointed out the defects he could discern and Morse took notes. Later in the day Morse telephoned Robert that an agreement had been reached and that there would be another meeting at the bank the next day.

November 3, Robert, Janet, a banker and Morse met at the financing Fort Dodge bank. Morse, according to the Menzels, told them the contractors had agreed to a $1500 escrow with the bank to assure the house defects would be fixed, that this was the largest escrow ever held out in a new home in Fort Dodge that he had heard of. Further, "we could go ahead with the closing and he would make sure everything would be taken care of." Morse testified that Robert asked at this meeting if the $1500 was adequate and he answered "it would be adequate to keep anybody from walking away from it"; that he felt it was adequate. He also testified at trial it was his "first sale of a new construction," he had no knowledge of building construction, made no effort to obtain the services of an expert or his broker to evaluate the problems in the house, had no knowledge of the building code, and made no effort to determine the adequacy of the escrow. Menzels closed the deal, with the bank providing $43,000 of the purchase money.

After Menzels moved into the house they found more serious defects. Among other problems, stringers under the ground floor had been cut to accommodate plumbing, resulting in a failure of support. Walls were out of plumb. Snow drifted in around doors and windows. The basement steps and other obvious features violated the building code. Pipes froze from lack of insulation. The most serious of these defects could not have been discovered by an inexperienced person. The contractors made one early visit to the house to fix the fireplace. The effort was unsuccessful.

Menzels first sued the contractors, who then instituted bankruptcy proceedings. The most Menzels were able to salvage from that source was the return of the $1500 escrow fund, and that by execution and delivery of a covenant not to sue, which specifically reserved their right to proceed against others.

After repairing some of the shabby work and obtaining an estimate of about $14,000

to repair other defects, the Menzels filed this action seeking $20,000 in damages. Division I of the petition alleged defendants breached their contractual and fiduciary relations with plaintiffs in nine particulars. These included failing to protect plaintiffs' interests and insist on strict performance by the contractor before closing; failing to insist on adequate escrow for defects prior to closing; discouraging plaintiffs from seeking legal advice when their interest so required; giving improper legal advice as to the effect of failure to close the transaction; failing to advise plaintiffs of building code requirements with respect to the house; and failing to advise plaintiffs the house had not passed official building inspection and to insist that this be done before closing. Division II alleged defendants were negligent in six specifications, including failure to conduct a reasonably competent and diligent investigation for defects in material and workmanship in the house and disclose the same to plaintiffs; in giving improper and erroneous legal advice as to the effect of plaintiffs' failure to close; in failing to develop a comprehensive list of defects and to insist on an adequate escrow fund to protect plaintiffs; and in failing to ascertain whether the house had passed final building code inspection. Defendants denied all of these allegations, but did not plead contributory negligence.

The trial evidence included the testimony referred to above. All the witnesses, including the defendants, were called by the plaintiffs. Morse testified the National Association of Realtors' Code of Ethics was "widely recognized and uniformly accepted by real estate sales persons and those in the real estate world in general." He stated it was required study for, and included in, the real estate salespersons' examination given by the Iowa Real Estate Commission. Later defendant broker Jones testified this code of ethics was recognized as

standards in the profession "between ourselves ... as [R]ealtors."[1] Menzels offered a copy of the above ethics code, identified by Morse, under "the rule applicable in ... industry's standards or standards of the profession [as] admissible evidence to show the norm of conduct required." This exhibit was admitted over defendants' objections.

Under examination, Morse admitted he was familiar with article 9 of the code of ethics, which provides, "The Realtor ... has an affirmative obligation to discover adverse factors that a reasonably competent and diligent investigation would disclose." He also indicated an awareness of article 11, prohibiting a Realtor from undertaking "to provide specialized professional services concerning a type of property or service that is outside his field of competence unless he engages the assistance of one who is competent on such types of property or service, or unless the facts are fully disclosed to the client," but he denied Menzels were his clients. At this point Morse volunteered he was "a subagent of the multiple listing service."

Morse testified he never studied the Fort Dodge building code, knew nothing about it, nor did he at any time ascertain whether a final building inspection had taken place prior to closing. He agreed that ethics code article 2 provided the Realtor "should endeavor always to be informed regarding laws, proposed legislation, governmental regulations ... in order to be in a position to advise his clients properly."

Finally, Morse agreed that ethics code article 17 provided:

> The Realtor shall not engage in activities that constitute the unauthorized practice of law and shall recommend that legal counsel be obtained when the interest of any party to the transaction requires it.

1. The record in this case indicates the word "Realtor" is registered and appropriately refers only to a member in good standing in the National Association of Realtors. Although the evidence does not reflect that Morse was a Realtor, it does reflect that the Realtors' code of ethics was recognized both by Morse and the Iowa Real Estate Commission as containing the applicable standards of conduct for both brokers and sales personnel.

Defendants elicited testimony from the Menzels that Robert was a college graduate and Janet had obtained three years of college education. They had bought two prior homes and sold two homes, utilizing brokers' services. Robert had been an automobile claims adjustor for a number of years. Under cross-examination he agreed that in his business he had numerous contacts with lawyers, and implied he had utilized an attorney for personal purposes.

At the close of evidence, trial court indicated it did not need trial briefs. The next day it filed its "Findings of Fact, Conclusions of Law, Judgment Entry and Decree," in which it "dismissed" the Menzels' action. In its conclusions of law trial court wrote the following:

> The Court does not believe that the Defendant is required to make any further inspection of the premises than were the Plaintiffs. ...
>
> ... The Court does not interpret the statements made by Mr. Morse to prohibit the Plaintiff, who is an educated businessman, from exercising his right to visit with legal counsel. ...
>
> ... [Plaintiffs] originally proceeded to obtain redress from the contractors but elected to accept the escrow money and hold the contractors harmless. The Court does not now believe that the Plaintiffs should be permitted to proceed against the realtor who could have had no more knowledge about the defects complained about in the faulty construction than the Plaintiffs could have had themselves from an observation of the property.

Menzels filed an Iowa Rule of Civil Procedure 179(b) motion, requesting trial court to amend or enlarge its findings and conclusions in the thirteen particulars, including a finding that Morse had a duty to make a reasonably competent and diligent investigation of the house for defects in material and workmanship; that Morse had no experience or qualifications in selling new construction but failed to disclose this to plaintiffs or secure competent assistance; that Morse was Menzels' agent for the purchase of real estate; that defendants did not plead contributory negligence; that under the doctrine of comparative negligence, there must be a finding of the percent of plaintiffs' negligence, if any, as compared to defendants' professional negligence. They prayed that judgment be entered accordingly. Trial court summarily overruled this motion without comment.

Menzels appeal, raising the issues, among others, discussed in the following divisions. In the posture of this appeal, we are not required to determine whether the breach of a fiduciary duty is properly cognizable in law, *see Clinton Land Co. v. M/S Associates, Inc.*, 340 N.W.2d 232, 234 n. 1 (Iowa 1983); *Linge v. Ralston Purina Co.*, 293 N.W.2d 191, 194–95 (Iowa 1980), or in equity, *see Laufert v. Wegner*, 245 Iowa 472, 473, 62 N.W.2d 758, 759 (1954); *Woolwine v. Bryant*, 244 Iowa 66, 67, 54 N.W.2d 759, 760 (1952). This case was tried as a law action in trial court and on appeal both parties proceed as though our review is on assigned error. In these circumstances we will review for corrections of errors of law. Iowa R.App.P. 4. Trial court's fact-findings are binding upon us if supported by substantial evidence. Iowa R.App.P. 14(f)(1). We view the evidence in the light most consistent with the judgment. Our deference to trial court's factual findings, however, does not extend to its determinations of law. *R.E.T. Corp. v. Frank Paxton Co.*, 329 N.W.2d 416, 419 (Iowa 1983).

I. We first examine the issue whether trial court erred in determining the standards of skill and knowledge to be applied to the activities of Morse, the real estate agent.

The only obligations or duties imposed on Morse in trial court's "Conclusions of Law" were to point out to the buyers "defects or violations of building codes which he [was] aware of" and not to "prohibit" plaintiffs from exercising their right to visit with legal counsel. Although the decision cites no authority, the court's conception of the first duty, above, may have been derived from an unsupported dictum in a 1964 deci-

sion, *Swift v. White*, 256 Iowa 1013, 1015–16, 129 N.W.2d 748, 750 (1964) ("If we assume defendant was [plaintiff buyer's] agent, his duty as a real estate broker can be no more than a full, fair and prompt disclosure of all facts within his knowledge which are or may be material."). The subjective-test limited duty articulated in *White*, however, did not comport with the applicable law at that time, and clearly is inapplicable here in view of the trial record.

The basic requirement is laid out succinctly in Restatement (Second) of Torts section 299A:

> Unless he represents that he has greater or less skill or knowledge, one who undertakes to render services in the practice of a profession or trade is required to exercise the skill and knowledge normally possessed by members of that profession or trade in good standing in similar communities.

Comment c makes plain that while ordinarily the undertaking is a matter of contract with the terms stated or implied, the rule does not depend upon the existence of an enforceable contract and applies as well when the services are undertaken gratuitously. The above Restatement rule was adopted early by this court, *McGulpin v. Bessmer*, 241 Iowa 1119, 1131, 43 N.W.2d 121, 126–28 (1950); *see Bartholomew v. Butts*, 232 Iowa 776, 779, 5 N.W.2d 7, 9 (1942),[2] and is conceded in defendants' brief to be the applicable law. The rule as presently applied in Iowa eliminates the words "in similar communities" and substitutes "under like circumstances," with the locality in question considered as merely one circumstance, not an absolute limit on the skill required. *Speed v. State*, 240 N.W.2d 901, 908 (Iowa 1976).

■ Application of the above general rule requires a plaintiff in a malpractice action to produce evidence to show the standards of conduct and practices, or bench marks, that establish the requisite skill and knowledge of members in good standing in the defendant's trade or profession.[3] *See Speed*, 240 N.W.2d at 908–09; *Dickinson v. Mailliard*, 175 N.W.2d 588, 596–97 (Iowa 1970). Standards of conduct and practice may be evidenced by expert testimony, see *Freese v. Lemmon*, 267 N.W.2d 680, 688 (Iowa 1978), by licensing and accreditation standards of hospitals, see *Dickinson v. Mailliard*, 175 N.W.2d at 596; *Darling v. Charleston Community Memorial Hospital*, 33 Ill.2d 326, 332, 211 N.E.2d 253, 256–57 (1965), *cert. denied*, 383 U.S. 946, 86 S.Ct. 1204, 16 L.Ed.2d 209 (1966), by the by-laws of a treatment center, *Darling*, 33 Ill.2d at 332, 211 N.E.2d at 257, by the accreditation requirements of professional associations, *Purcell v. Zimbelman*, 18 Ariz.App. 75, 80–81, 500 P.2d 335, 341 (1972); *Avey v. St. Francis Hospital and School of Nursing, Inc.*, 201 Kan. 687, 695, 442 P.2d 1013, 1020–22 (1968), and by the Code of Professional Responsibility for Lawyers, *Woodruff v. Tomlin*, 616 F.2d 924, 936 (6th Cir.), *cert. denied*, 449 U.S. 888, 101 S.Ct. 246, 66 L.Ed.2d 114 (1980); *Lysick v. Walcom*, 258 Cal.App.2d 136, 146–47, 65 Cal.Rptr. 406, 413 (1968); *Ishmael v. Millington*, 241 Cal.App.2d 520, 526–27, 50 Cal.Rptr. 592, 595–96 (1966); *Crest Investment Trust, Inc. v. Comstock*, 23 Md.App. 280, 302–04, 327 A.2d 891, 905 (1974); *Hansen v. Wightman*, 14 Wash. App. 78, 94, 538 P.2d 1238, 1250–51 (1975).[4]

**2.** Restatement (Second) of Torts § 299A also was quoted approvingly in *Kastler v. Iowa Methodist Hospital*, 193 N.W.2d 98, 101 (Iowa 1971).

**3.** *See* W. Prosser, *Handbook of the Law of Torts* § 53 (4th ed. 1971): "[I]n negligence cases the duty is always the same, to conform to the legal standard of reasonable conduct in light of the apparent risk. What the defendant must do, or must not do, is a question of the standard of conduct required to satisfy the duty."

**4.** The theory underlying the admission of such evidence in tort actions involving the malpractice of persons involved in a profession or trade is essentially the same as that we have applied to permit the introduction of a private safety code, *Jorgensen v. Horton*, 206 N.W.2d 100, 103 (Iowa 1973), and a maintenance manual, *Ehlinger v. State*, 237 N.W.2d 784, 788–89 (Iowa 1976), as evidence tending to establish the negligence of the defendant. *See generally* J. Dooley, *Modern Tort Law* § 3.28 (1982). In other contexts courts have turned to ethical canons and American Bar Association standards to gauge the normal competency of the bar, and accepted practices and procedures. *See Marzullo v.*

More specifically, courts have turned to published ethical standards and practices of real estate brokers to determine the requisite skill and knowledge, and acceptable practices, of members in good standing in that occupation. *See Baker v. Leight*, 91 Ariz. 112, 117–18, 370 P.2d 268, 271 (1962) ("It is immaterial as to whether the broker is a member of the National Association if it is definitely established that this Association's Code of Ethics has been adopted and is applicable to those in the real estate profession in this state."); *Pepper v. Underwood*, 48 Cal.App.3d 698, 714, 122 Cal. Rptr. 343, 355 (1975), *overruled on other grounds, Stout v. Turney*, 22 Cal.3d 718, 730, 586 P.2d 1228, 1235, 150 Cal.Rptr. 637, 644 (1978) ("[U]pon proper proof that the Canons of Ethics adopted by the National Association of Real Estate Agents, established standards of conduct to be adhered to and which were adhered to by real estate brokers and agents in the Santa Barbara area, such canons would be admissible as rebuttable evidence of such standard of care."); *Hoefer v. Wilckens*, — Mont. —, —, 684 P.2d 468, 472 (1984) (Trial court's findings of specific acts or omissions constituting broker malpractice "based largely on the standard of care required of realtors in Lake County under the Code of Ethics and Standards of Practice of the National Association of Realtors."); *Burien Motors, Inc. v. Balch*, 9 Wash.App. 573, 578, 513 P.2d 582, 586 (1973) ("The evidence also showed that under the 'Standards of Practice and the Code of Ethics of the Seattle-King County Real Estate Board,' to which [the broker] subscribed, he was required to check city or county zoning regulations ap-

plicable to real property to be sold or leased and to endeavor to keep informed concerning information substantially affecting those interests.").

In the case before us defendants' admissions established the National Association of Realtors Code of Ethics as accepted standards in the profession and required study for, and included in, the written examinations leading to licensing in Iowa. The 1978 *Real Estate Manual* (and subsequent manuals) issued by the Iowa Real Estate Commission,[5] pp. 142–46, contains this code of ethics, including of course, the three provisions relied on by the Menzels set out in the above statement of facts.[6] This publication also contains another section entitled "Ethics" in which the following similar provisions are found:

If a point of law is involved, then the licensee should not attempt to advise his client outside the field of his competency, but should advise consultation with a lawyer.

Property should be offered by a licensee solely on its merit without exaggeration and misrepresentation. Always truthfully present data, but be careful to indicate any defects with which you are or should be familiar. You should familiarize yourself with zoning ordinances or restrictions, especially as they might affect the purpose for which the parcel is sought.

. . . .

The licensee should advise the use of legal counsel . . . .

---

*Maryland*, 561 F.2d 540, 544 (4th Cir.1977), *cert. denied*, 435 U.S. 1011, 98 S.Ct. 1885, 56 L.Ed.2d 394 (1978); *State v. Schoelerman*, 315 N.W.2d 67, 72 (Iowa 1982); *Omaha Bank for Coop v. Siouxland Cattle Coop.*, 305 N.W.2d 458, 461 (Iowa 1981); *State v. Whiteside*, 272 N.W.2d 468, 470–71 (Iowa 1978).

**5.** We may judicially note this manual as a public document issued by a state agency. *Salsbury Laboratories v. Iowa Department of Environmental Quality*, 276 N.W.2d 830, 835 (Iowa 1979).

**6.** The commission's "Forword" to the manual, pp. ii–iii states its purposes to be

for the use and benefit for real estate brokers, salespersons, and apprentice salespersons and those individuals who may be seriously thinking of entering the business.

The information contained in this manual is basic fundamentals, believed to be necessary for a sound introduction to the real estate business. . . .

. . . .

It is not the purpose of this study manual to be the sole source to prepare an applicant for the [real estate] test.

Iowa Real Estate Commission, *Real Estate Manual* 141–42 (1978).[7]

The standard of practice Menzels rely on, contained in article 17 of the Code of Ethics of the National Association of Realtors (mandating that the Realtor "shall recommend that legal counsel be obtained when the interest of any party to the transaction requires it") is again underscored by the following provisions, also set out in the *Real Estate Manual*, under the caption "Duties":

> [T]he contract used should be drawn with adequate legal advice and in strict accordance with local laws and all principals in the transaction should receive legal counsel. The legal rights of the buyer and seller must be protected throughout the transaction. The salesperson and his firm are largely responsible for seeing to this. The real estate professional is a professional in his field and in his field only. He should never attempt to practice law along with real estate.

Iowa Real Estate Commission, *Real Estate Manual* 65 (1978).

Thus there was no reason for Morse to misinterpret or misapply the standards set out in the Realtor's Code of Ethics, nor does he assert any such misunderstanding. The difficulty posed by this appeal is that trial court obviously did not recognize these standards as bench marks by which to measure the activities of Morse in this real estate transaction.

■ Although violation of these standards is only evidence of negligence and not negligence per se as in the case of a violation of statute or regulation, *see Ehlinger,* 237 N.W.2d at 788–89; *Jorgensen,* 206 N.W.2d at 102–03, we find trial court's rejection of the standards in favor of rules of conduct, skill and knowledge neither supported in our cases nor in the evidence, is reversible error.

With respect to a real estate licensee's obligation to exercise professional skill and knowledge in this transaction, trial court

imposed no greater burden on Morse than on Robert Menzel. Trial court found it sufficient that Morse did not "forbid" the Menzels to seek legal counsel when they obviously needed it. The court thus ignored, if it did not reject, the recognized standard that the real estate broker or salesperson *affirmatively* should recommend that legal counsel be obtained in these situations.

■ As a matter of public policy, consideration should be given to evidence of applicable ethical standards when, as here, they are placed in evidence and admitted by defendants to be recognized and followed in the trade or profession. A cursory examination of the *Real Estate Manual* issued by the Iowa Real Estate Commission discloses a determined effort to lift the real estate business to a professional status. The commission's "Foreword," referred to above, provides this insight:

> The act of being licensed to serve as a real estate broker or a real estate salesperson or apprentice salesperson is an endorsement to the effect that you are recommended to the Public as an honorable, capable, trustworthy citizen. In accepting employment as a broker or salesperson or apprentice-salesperson, you are pledging yourself to protect and promote the best interests of your clients, both sellers and buyers. This obligation of absolute fidelity is primary.
>
> The state of Iowa has only one means of regulating individuals handling real estate transactions for others for a fee or a consideration, and this is through licensing. By employing this method alone, government permits those who meet an established set of qualifications to practice this trade, no others may do so. Thus the system cannot discriminate between varying levels of ability within a profession.

Iowa Real Estate Commission, *Real Estate Manual* iii (1978).

297 N.W.2d 334, 340 (Iowa 1980).

---

7. The 1980 edition of this manual was relied on for a standard of practice in *Miller v. Berkoski,*

Courts in this and other jurisdictions, examining the obligations of one licensed to engage in the real estate business and protected by a state-created monopoly, see *Milholin v. Vorhies*, 320 N.W.2d 552, 554 (Iowa 1982), have sought to impose high standards. *See, e.g., Miller*, 297 N.W.2d at 340 ("This case does not present a situation justifying a retreat from these modern decisions that lift the ethics of honest agents and fiduciaries to the benchmark of legal obligations."); *Zichlin v. Dill*, 157 Fla. 96, 98, 25 So.2d 4, 4–5 (1946) ("The state ... has prescribed a high standard of qualifications and by the same law granted a form of monopoly and in so doing the old rule of *caveat emptor* is cast aside. Those dealing with a licensed broker may naturally assume that he possesses the requisites of an honest, ethical man."); *Dugan v. Jones*, 615 P.2d 1239, 1248 (Utah 1980) ("In this state, it is apparent that the rule of caveat emptor does not apply to those dealing with a licensed real estate agent. Though not occupying a fiduciary relationship with prospective purchasers, a real estate agent hired by the vendor is expected to be honest, ethical, and competent and is answerable at law for breaches of his or her statutory duty to the public."); *Tennant v. Lawton*, 26 Wash.App. 701, 706, 615 P.2d 1305, 1309–10 (1980) ("The underlying rationale of [a broker's] duty to a buyer who is not his client is that he is a professional who is in a unique position to verify critical information given him by the seller. ... The broker is required to employ a reasonable degree of effort and professional expertise to confirm or refute information from the seller which he knows, or should know, is pivotal to the transaction from the buyer's perspective."); *Hagar v. Mobley*, 638 P.2d 127, 138 (Wyo.1981) ("Realtors, just like doctors, lawyers, engineering consultants, and builders, hold themselves out as professionals; it is their job to know their profession. People rely on and trust them. Failure to comply with either the accepted standards in the field or the standards society is willing to recognize as acceptable, is actionable.").

Upon remand, trial court should consider the evidence of the standards of skill, knowledge and practice adduced in this record and examine the acts and conduct of the respective parties in light of such bench marks as are established by such evidence. Our exhaustive treatment of those standards in this opinion should not be construed as an indication of any opinion of this court as to the ultimate disposition of this case.

II. Only one division of plaintiffs' brief is devoted to their theory that Morse breached a fiduciary duty to Menzels. This theory is complicated by trial court's failure to address the issue whether Morse was or was not Menzels' agent in this real estate transaction. Morse, of course, may have had a duty not to negligently cause harm to Menzels regardless of whose agent he was, as illustrated by the authorities referred to in the last division. The specifications of the alleged breach set out in division I of plaintiffs' petition are almost identical with the specifications of alleged negligence in division II. In our view division I of the petition is significant only to the extent the alleged agency, if shown, stripped the defense of any claim of lack of privity between Morse and Menzels, and to the extent it underscored Morse's obligation to exercise reasonable care, diligence and judgment in the transaction.

The relationship between a broker or agent and his or her principal is confidential and fiduciary, including a strict duty of undivided loyalty and disclosure. *Clinton Land Co.*, 340 N.W.2d at 234; *Miller v. Berkoski*, 297 N.W.2d 334, 338 (Iowa 1980).

> Generally an agent owes his principal the use of such skill as is required to accomplish the object of his employment. If he fails to exercise reasonable care, diligence, and judgment in this task, he is liable to his principal for any loss or damage occasioned thereby.

*Collegiate Manufacturing Co. v. McDowell's Agency, Inc.*, 200 N.W.2d 854, 857 (Iowa 1972). "[G]enerally speaking, the broker is liable for all losses directly result-

ing from his failure to exercise the standard of skill and care imposed on him by law. ..." Annot., 94 A.L.R.2d 468, 473 (1964).

The briefs on each side in this appeal disclose an uncertainty whether trial court held there was a principal-agent relationship between Menzels and Morse, and each argued from both alternatives. Menzels sought a direct finding on this point in their motion under Iowa Rule of Civil Procedure 179(b), which the court summarily overruled. In division I, we pointed out that the agency issue may not be controlling given plaintiffs' evidence that certain standards of skill, knowledge and conduct are designed to benefit both parties to a real estate transaction. For the purposes of this discussion, however, we will assume the court found Morse was the agent of the sellers. Addressing this alternative, Menzels' brief contends the finding would not be supported by substantial evidence.

■■■ An agency may be proven not only by direct evidence of an agreement between the parties, but also by circumstantial evidence, such as their words and conduct, from which an intention to create an agency may be fairly implied. *Walnut Hills Farms v. Farmers Coop. Co.*, 244 N.W.2d 778, 781 (Iowa 1976). It has been stated broadly that a real estate broker is the agent of the party who first employs him or her, and this may be the buyer even though it is anticipated the fee will be received from the seller. 12 C.J.S. *Brokers* § 32 (1980). This rule has been adopted in Iowa. *Havner v. Miller*, 191 Iowa 865, 870–71, 183 N.W. 509, 511 (1921). The duty of an agent acting gratuitously is the same as that of other agents. *Swift v. White*, 256 Iowa at 1020, 129 N.W.2d at 752; *see Burien Motors, Inc. v. Balch*, 9 Wash.App. 573, 576, 513 P.2d 582, 585 (1973); 12 Am.Jur.2d *Brokers* § 96 (1964).

In this case there was overwhelming evidence that Morse commenced his relationship with the Menzels as their agent. He sought out and solicited Menzels to make them "his customer[s]." There was a plain implication he would provide his services to find them a suitable home, and they agreed to, and did, accept his services. That this was the agreement was established beyond dispute when he later, in Menzels' absence, drafted the instrument that was to be submitted to the sellers and signed it as their agent. Morse argues that "[t]he house in question was listed on the multiple listing sheet and Menzels were knowledgeable of the fact and its implications." Neither the asserted implications nor any evidence of Menzels' knowledge of any such implications appear in this record. The most that could be implied from this circumstance is that Morse would receive some part of the commission from the listing broker. There is no scintilla of evidence that Morse knew the sellers or ever had any contact with them. There is only his bare assertion that he did not tell Menzels to get a lawyer because he "was representing the sellers."

■■■ At the same time, the record is clear that Morse never told Menzels he was not representing them. Nor did he tell them he was representing the sellers. Our long-established case law makes plain that a broker or agent may represent both buyer and seller only with the knowledge and consent of both. *Casady v. Carraher*, 119 Iowa 500, 502, 93 N.W. 386, 386 (1903) ("The agent cannot serve two principals without the intelligent consent of both. ...."); *Darling v. Nineteen-Eighty Corp.*, 176 N.W.2d 765, 768 (Iowa 1970) ("There is no evidence such information or consent [to become a common agent of the parties] was ever given."); *see* Iowa Real Estate Commission, *Real Estate Manual* "Duties" p. 64 ("[T]he broker cannot act for both parties in the transaction without the knowledge of both."); Restatement (Second) of Agency § 391 (1958). Violation of this rule is a ground for revocation or suspension of license. Iowa Code § 117.-34(4) (1981).

■■■ We find no substantial evidence in this case to support a finding that Morse was representing the sellers in this sale of real estate. The evidence was sufficient to establish, as a matter of law, that he was representing Menzels throughout the trans-

action. Upon remand Morse's activities and conduct must be viewed in light of the agency relationship between him and the Menzels.

III. We view the other alleged errors raised by the Menzels as not established, or as not controlling trial court's disposition of this case.

■ The Menzels argue the district court erred in holding that the covenant not to sue executed in favor of the sellers barred the Menzels from proceeding against Morse and Jones. Such an application of law, of course, would be error, as a covenant not to sue protects only the tortfeasors to whom it runs. *Pedersen v. Bring,* 254 Iowa 288, 291, 117 N.W.2d 509, 511 (1962).

Viewing the court's statement in the light best adapted to sustaining its ruling, however, we think it may be interpreted simply to mean that Menzels, after executing the covenant, decided to proceed against these defendants on standards of skill, knowledge and conduct that the court was unwilling to examine.

Menzels also argue trial court was patently erroneous in several factual findings. In at least two instances there is no substantial evidence to support the court's factual findings. For example, Menzels' expert witness Roe did not testify that the defects in the house were part of the aging process, as found by the court. Contrary to a statement in trial court's "Conclusions of Law," there is no substantial evidence that Richard Menzel had any experience in adjusting house damage before the Fort Dodge move that could have given him any prior expertise in new home construction. There is no indication, however, these findings played a substantial role in the court's disposition of the case.

Finally, Menzels contend trial court implicitly concluded their claim was barred by contributory negligence, a defense not pleaded by defendants. They assert if, despite this, the court was to consider their negligence, it should have been under the concepts of *Goetzman v. Wichern,* 327 N.W.2d 742, 754 (Iowa 1982), filed before the trial of this case. Menzels' rule 179(b) motion raised this issue in district court. It is as likely, in our view, that the court, by rejecting the standards of skill, knowledge and conduct conceded by defendants to be applicable in this case, simply found defendants had no duty toward the Menzels and therefore concluded it was unnecessary to weigh the contributory negligence, if any, of the Menzels.

IV. A new trial would be an unnecessary and duplicative expenditure of the litigants' time and resources. The facts were developed fully in the record that has been certified to this court. Trial court erred in selecting the applicable law.

> Where, in a case tried by the court without a jury, the trial court errs as to the rule of law to be applied ... in making its findings, the appellate court should vacate the findings made and remand with directions to reconsider the entire record and make new findings in the light of the applicable rule of law.

5 Am.Jur.2d *Appeal and Error* § 966 (1962). We reverse and remand with directions that this case be resubmitted to the trial court upon the record already made, with the parties accorded the right to reargue the issues and the evidence to be viewed in accordance with the applicable law set out in this opinion. *See C.F. Sales, Inc. v. Amfert, Inc.,* 344 N.W.2d 543, 556 (Iowa 1983); *Knight v. Anderson,* 292 N.W.2d 411, 417 (Iowa 1980); *Oehlert v. Kramer,* 205 N.W.2d 723, 727 (Iowa 1973); *Busker v. Sokolowski,* 203 N.W.2d 301, 304 (Iowa 1972).

REVERSED AND REMANDED.

All Justices concur except CARTER, J., who concurs specially and WOLLE, J., who concurs in part and dissents in part.

CARTER, Justice (concurring specially).

I concur in divisions II, III, and IV of the court's opinion and the result.

With respect to division I of the opinion, I would find that defendants' recognition of the *Real Estate Manual* is only in an aspi-

rational sense personal to them and not as evidencing legal standards by which their conduct is to be measured in deciding the plaintiffs' rights. Notwithstanding that conclusion, I believe that there are factual issues, not considered in the trial court's opinion, which would permit the court to find a duty on the part of defendant Morse to suggest that plaintiffs seek legal counsel.

WOLLE, Justice (concurring in part and dissenting in part).

I concur in divisions III and IV of the majority opinion but respectfully dissent from divisions I and II.

I agree with the division IV direction that this case be remanded to the trial court for resubmission on the record already made. The trial court in this jury-waived law action did not adequately comply with Iowa Rule of Civil Procedure 179(a), which requires that the court find the facts in writing and separately state its conclusions of law. The trial court's written decision did not clearly disclose what facts it found were established by the evidence. Neither did its conclusions of law specify what legal principles were controlling as applied to the established facts. The plaintiffs, Menzels, carefully preserved their record for appeal by moving the court to enlarge its findings and conclusions in accordance with rule 179(b). See Michael v. Merchants Mutual Bonding Co., 251 N.W.2d 531, 533 (Iowa 1977) (party aggrieved by trial court's failure to render findings or conclusions waives error by failing to file rule 179(b) motion). The trial court might have headed off this appeal, or at least avoided the remand which now is necessary, if in ruling on the motion it had responded directly to each of the Menzels' thirteen specific requests for enlarged findings on material issues. The trial court, however, overruled the motion without addressing each individual request for enlargement.

I also agree with the division III holding concerning several assignments of error which are without merit. The trial court did not base its decision on the covenant not to sue which Menzels had given the contractor, nor did it find their claim barred by contributory negligence.

I dissent from division II because in my view the evidence was not sufficient to establish as a matter of law that defendant Morse was the agent for the Menzels. The majority correctly treats this issue as primarily a question of fact. See Walnut Hills Farms v. Farmers Cooperative Company of Creston, 244 N.W.2d 778, 780–81 (Iowa 1976). The burden of proving the principal and agent relationship was upon the Menzels as the parties asserting the relationship. Ioerger v. Schumacher, 203 N.W.2d 572, 575 (Iowa 1973); Martin v. Jaekel, 188 N.W.2d 331, 333 (Iowa 1971). In deciding whether the relationship was established as a matter of law, the evidence should be viewed in the light most favorable to defendants. Iowa R.App.P. 14(f)(2). The majority opinion, however, summarizes the evidence supporting Menzels' position on this issue and concludes there is no substantial evidence to support Morse's contention that he was representing the sellers. I view the record differently, finding evidence sufficient to generate questions for the trier of fact to resolve on the issue whether Morse was an agent for the seller in this transaction.

First, Morse testified that his occupation was to act as "an agent for our sellers," that the seller pays the listing agent and the listing agent the selling agent, and that is what in fact occurred in this transaction. He pointed out that he was acting as a sub-agent of the multiple listing service, with the seller the client in this case. This is not unprecedented; Morse's description of the relationship between a real estate salesperson and the seller in a multiple-listing situation is similar to that described in First Church of the Open Bible v. Cline J. Dunton Realty, Inc., 19 Wash.App. 275, 279, 574 P.2d 1211, 1214 (1978). See generally Gaudio, The Iowa Law of Real Estate Brokerage, 30 Drake L.Rev. 437, 482–83 (1980). Morse also testified that his function in this transaction was that of market-

ing, the same as if the buyer "buys a suit of clothes and the salesman gets a commission."

Defendant Dave Jones, for whom Morse was a selling agent, testified that the situation here was the normal one, with the commission paid by the seller and the contract with the seller. He distinguished this from the situation where a buyer hires and agrees to pay a real estate agent to secure a given piece of property.

In my view, this testimony alone, admitted without objection, presented an issue of credibility for the trier of fact to resolve as to whether the broker Jones and the salesperson Morse were agents for the seller as they contend or agents for the buyers as Menzels claim.

Our review is not de novo because this law action was tried by ordinary proceedings. Iowa R.App.P. 14(f)(1). Had the trial court found the facts as the majority opinion finds them, I would agree that substantial evidence supports Menzels' claim that Morse was their agent. The trial court did not make such findings of fact. The evidence is genuinely in dispute and arrayed on both sides of this pivotal agency question. I would have the trial court make the initial factual determination whether Morse was the agent for the seller as he contended or for Menzels as they contended. The trial court, not this court, should also decide whether the broker Dave Jones was or was not an agent for the buyers in this transaction.

The law should be realistic as well as idealistic. We should recognize that real estate brokers and their salespersons, with whom property is frequently listed for sale and marketed either directly or through a multiple-listing service, ordinarily become the agents of the seller for the purpose of finding a purchaser. *See Frisell v. Newman*, 71 Wash.2d 520, 525–26, 429 P.2d 864, 867 (1967). Included in that usual agency relationship between the real estate broker or salesperson and the seller is the strict duty of undivided loyalty and disclosure. *Clinton Land Co. v. M/S Associates, Inc.*, 340 N.W.2d 232, 234 (Iowa 1983);

*Miller v. Berkoski*, 297 N.W.2d 334, 338 (Iowa 1980); *see* Restatement (Second) of Agency § 387 ("Unless otherwise agreed, an agent is subject to a duty to his principal to act solely for the benefit of the principal in all matters connected with his agency."). The relationship is confidential and fiduciary. *Miller v. Berkoski*, 297 N.W.2d at 339.

I believe that in determining whether a broker or salesperson has undertaken to serve the seller or buyer in a given transaction, the trial court may and should give appropriate weight to evidence that these persons ordinarily are paid by the seller and must faithfully represent the seller. The trial court should also be allowed to consider on this the fact that the buyers, like Menzels here, had had previous experience selling homes, with real estate salespersons representing them in those transactions.

Because I do not find that the evidence here established conclusively that defendants were Menzels' agents in this transaction, I must also dissent from division I which describes the standards of skill, knowledge and practice by which the trial court on remand must now measure the defendants' conduct.

If upon resubmission the trial court were allowed to find and did find that Morse and Jones were serving as agents for the seller and not for Menzels, their duties toward Menzels would properly be measured by principles of negligence law, the theory of the second count of Menzels' petition, and not by the fiduciary duties pleaded in the first count of Menzels' petition. For example, if the trial court were in fact to find that defendants were agents for the seller and not the Menzels, the court still might hold defendants liable for negligence if they misrepresented facts or failed to disclose to the Menzels information that a reasonably prudent salesperson representing a seller would disclose to buyers. *See Beeck v. Kapalis*, 302 N.W.2d 90, 96–97 (Iowa 1981) (describing elements of tort of negligent misrepresentation); *Smith v. Peterson*, 282 N.W.2d 761, 766–67 (Iowa Ct.

App.1979) (real estate agent for seller held . liable to purchaser for failing to disclose information about which realtor had superior knowledge). In that situation, however, the legal duties which defendants would owe to the Menzels should be viewed in the light of and harmonized with defendants' duties, including their duty of loyalty, owed to their principal, the seller. As the Florida Supreme Court has explained in a situation where the broker was the agent for the buyer:

> It follows that when a buyer and seller are dealing with one another at arm's length, a broker employed by one party is not bound to disclose everything he knows to the other party. Indeed, his duty of loyalty to his principal may well preclude his doing so.

*Ellis v. Flink*, 374 So.2d 4, 5 (Fla.1979); *see Stevens v. Jayhawk Realty Co.*, 9 Kan. App. 338, 342, 677 P.2d 1019, 1023 (1984) (quoting *Ellis* in case where broker represented seller, not buyer).

Menzels contend, among other things, that the defendants should have undertaken to discover structural defects in this nearly-completed home, perhaps by hiring a structural engineer. The Vermont Supreme Court has recently described, realistically I believe, one aspect of the duty a seller's agent owes a buyer of real estate:

> As an agent of a seller, a real estate broker or agent is guilty of negligent misrepresentation only if he or she passes information from a seller to a buyer that he or she knows or has reason to know may be untrue. Real estate brokers and agents are marketing agents, not structural engineers or contractors. They have no duty to verify independently representations made by a seller unless they are aware of facts that "tend to indicate that such representation[s are] false."

*Provost v. Miller*, 144 Vt. 67, 69–70, 473 A.2d 1162, 1164 (1984), *quoting from Lyons v. Christ Episcopal Church*, 71 Ill. App.3d 257, 259–60, 27 Ill.Dec. 559, 561, 389 N.E.2d 623, 625 (1979).

I would remand this case for reconsideration by the trial court of all of the issues addressed in divisions I and II of the majority opinion, not with the critical agency question predetermined by this court.